172 So.2d 354 (1965)
William R. BENEDETTO
v.
TRAVELERS INSURANCE COMPANY and Maryland Casualty Insurance Company.
No. 1686.
Court of Appeal of Louisiana, Fourth Circuit.
February 8, 1965.
Rehearing Denied March 8, 1965.
Emile J. Dreuil, Jr., New Orleans, for plaintiff-appellee.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Ashton R. Hardy, New Orleans, for Travelers Ins. Co., defendant-appellant.
Sessions, Fishman, Rosenson & Snellings, James C. Murphy, Jr., New Orleans, for Maryland Casualty Co., defendant-appellant.
Before REGAN, YARRUT, and TURNER, JJ.
HENRY F. TURNER, Judge pro tem.
Plaintiff brought this suit against Maryland Casualty Insurance Company, the public liability insurer of Mrs. William Cullen, mother of the 13-year-old child, Julia Cullen, and The Travelers Insurance Company, public liability insurer of the Congregation of St. Francis Xavier Cabrini Roman Catholic Church, on behalf of his minor daughter, Cheryl Benedetto, primarily and incidentally on his own behalf for medical expenses to be incurred. The suit arises out of an accident that occurred on the premises of the St. Francis Cabrini School in New Orleans, Louisiana, on April 19, 1963, when a group of young girls, ranging in age from 11 to 13 years, were playing a game of softball during a morning 20-minute recess. Julia Cullen, daughter of Mrs. Cullen, insured by the defendant Maryland Casualty Company, was at bat and hit a pitched softball into right field, whereupon she disengaged herself *355 from the bat she was using, and the bat in some manner not fully explained struck Cheryl Benedetto, who was sitting along the third-base line eight or ten feet back from the base line, in the mouth, knocking one tooth completely out and breaking another one.
The plaintiff alleged negligence on the part of Julia Cullen by throwing or dropping the bat in the manner in which she did and negligence against St. Francis Cabrini School for permitting the softball game to be played in the area in which it was being played and also for improper supervision of the school children in its charge.
After hearing the evidence, the District Court rendered judgment for the plaintiff against both defendants, stating in its reasons for judgment that the school was negligent in permitting this softball game to be played in this particular area and, further, that the children were not given proper supervision. The District Court also concluded that Julia Cullen was negligent in her behavior.
We are unable to agree with our learned brother of the lower court in either conclusion. A careful review of the record in the case reveals that a few minutes after classes were dismissed for this 20-minute morning recess a group of young girls full of life and energy organized and began playing a softball game in an area between Prentiss Avenue and the Administration Building and a sidewalk that runs along Prentiss Avenue. Plaintiff's little daughter, 12 or 13 years of age at the time of the accident, was sitting along the third-base line some distance variously estimated at from 8 to 11 feet to the rear of a right-handed batter. The testimony is conflicting as to when she first sat there on this occasion. There is some evidence that Sister Louis Marie, one of the supervisors, shortly prior to the accident had spoken to some girls who were sitting at or in the same position as Cheryl Benedetto, and the girls had moved as a result of the Sister's having spoken to them. Whether Cheryl was one of the girls spoken to at that time or not we are not able to determine. Cheryl had previously sat on the sidewalk before to observe these games.
Counselor for plaintiff in brief stated that Julia Cullen flung the bat and it struck Cheryl Benedetto on the fly. The record does not support this. No one seems to know exactly how the bat was thrown or in what manner it struck Cheryl.
Baseball, being recognized as a national pastime, is well known to all, including 12-and 13-year-old children. In fact, Cheryl testified that she had played ball on occasions, and her younger sister was playing in this particular game. There is no prescribed way, under any supervision, in which to disengage oneself from the bat once he or she has successfully struck the ball in such a manner as to appear to be a safe hit. The batter's concern is to get rid of the bat and head for first base as fast as he can. We have never heard of nor have we ever seen a batter carry the bat to first base with him. The normal and natural thing for Julia Cullen to do was to drop or get rid of the bat so she could run to first base.
This unfortunate accident resulted from her dropping or throwing the bat in the manner in which she did. We are not prepared to say that she is negligent in so doing. Counsel for plaintiff refers to her repeatedly as having a propensity to throw bats. The record does not bear this out. She admitted that on one occasion she let the bat go and it went a little father than bats ordinarily go when dropped by the batter. In answer to the question:
"Q. Julia, did this bat slip out of your hand or did you consciously let it go after having struck the ball?
"A. I just let go. I mean I hit the ball and I saw nobody had caught it or anything yet, so I dropped the bat or let go of it." *356 Then, again, she stated:
"Q. Julia, tell the Court something about some of these other instances when you threw a baseball bat?
"A. Well it was a baseball game and I hit the ball and I let go of the bat, and I guess I threw it because it went farther than the bats usually go when you let go of them."
One of the players, a Miss Jane Bopp, who was a particular friend of Julia's, had this to say about Julia's bat-throwing propensity:
"Q. You stated that Julia Cullen let the bat go on occasions?
"A. Uh, huh.
"Q. Did she let the bat go every time?
"A. Well most of the time when she hit the ball.
"Q. She let the bat fly?
"A. Well she doesn't exactly throw it. She just lets it go. She doesn't put it on the ground. She lets it go."
We think this testimony is far from establishing Julia's propensity to throw bats. Certainly, she acted as any normal 12- or 13-year-old child would do in the accepted game of Softball. Softball is not an inherently dangerous undertaking, and the school was not negligent in permitting a softball game to be played. The record shows that there is more than ample space for the children to engage in this softball game in the particular area where they were playing, despite the lower court's finding to the contrary. In fact, the recreation areas of St. Francis Cabrini School are divided into four different areas so that the boys would have one area and the girls of different ages would have the other areas. There were approximately 250 to 400 children playing in this particular area. The accident was one of those unfortunate occurrences that happen daily throughout the United States on school grounds. No amount of supervision could have prevented this. In fact, we find from the record that this school had ample supervision. While it is true that there was no supervisor present to witness the accident, that does not mean that the children lacked supervision. The evidence shows that there were two supervisors in this particular area, and Sister Louis Marie had just relieved a Mrs. Wandell, a lay teacher and supervisor who had served her 10-minute period.
While we find from the evidence that there was no negligence on the part of Julia Cullen, it is our view that if such negligence did in fact exist Cheryl Benedetto had assumed the risk or was guilty of contributory negligence under the holding of this court in a recent case, Colclough v. Orleans Parish School Board, 166 So.2d 647.
On the date of the trial the principal of the school testified that they still used this same area for softball. As far as the record shows, no accident had happened in this area previous to or since Cheryl's accident. We think the case is no different from one in which Cheryl might have been hurt by a catcher chasing a fly ball or a foul ball hit in her direction. She, having played baseball or having watched baseball, is certainly familiar with these dangers.
For the reasons assigned, the judgment of the lower court is reversed, and plaintiff's suit dismissed at his cost.
Reversed.