# IN THE SUPREME COURT OF IOWA

No. 07–0127

Filed March 13, 2009

**TARA SWEENEY,** Individually, and by
**CYNTHIA SWEENEY,** Her Mother and Next Friend,

Appellants,

vs.

**CITY OF BETTENDORF AND
BETTENDORF PARKS AND RECREATION,**

Appellees.

Appeal from the Iowa District Court for Scott County, J. Hobart Darbyshire, Judge.

Plaintiffs appeal district court's grant of summary judgment in negligent supervision case. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Joseph C. Creen of Bush, Motto, Creen, Koury & Halligan, P.L.C., Davenport, for appellants.

Martha L. Shaff and Edward J. Rose of Betty, Neuman & McMahon, P.L.C., Davenport, for appellees.

**APPEL, Justice.**

This case involves an appeal from a district court order granting the City of Bettendorf summary judgment in a negligent supervision case. Here, an eight-year-old girl was injured by a flying baseball bat at a minor league game while on a field trip sponsored by the Bettendorf Parks and Recreation Department. The district court found that a permission slip signed by the parent of the injured girl amounted to an enforceable anticipatory release of future claims against the City. The district court in the alternative ruled that the plaintiffs failed to introduce sufficient evidence to show that the City violated a duty of care owed to the plaintiffs. For the reasons expressed below, we affirm in part, reverse in part, and remand the case to the district court.

### I. Background Facts and Prior Proceedings.

Eight-year-old Tara Sweeney enjoyed baseball games. She participated in field trips to Davenport, Iowa, sponsored by the Bettendorf Parks and Recreation Department to see minor league baseball games. In the past, according to Tara, the children sat in "comfy seats" behind home plate that were protected by screening.

In 2003, Tara wanted to go to another ball game. Prior to the field trip, Tara's mother, Cynthia Sweeney, was asked to sign what was entitled a "Permission Slip," which the Department required of all participants. The text of the "Permission Slip" was as follows:

> I hereby give permission for my child Tara M. Sweeney to attend the Bettendorf Park Board field trip to John O'Donnell Stadium with the Playgrounds Program on Monday, June 30, 2003. I realize that the Bettendorf Park Board is not responsible or liable for any accidents or injuries that may occur while on this special occasion. Failure to sign this release as is without amendment or alteration is grounds for denial of participation.

Prior to signing the "Permission Slip," Cynthia talked with a supervisor about the trip. She was told the times of the field trip and who would be supervising Tara's group. She then executed and returned the permission slip to the Department.

At the game, the children did not sit in the "comfy seats" behind screening as they had in the past. Instead, Tara was required by the Department to sit on bleachers or the adjacent grassy area along the third base line that was unprotected by screening or netting. Tara chose a seat in the third or fourth row of bleachers. The Department supervisors did not allow the children to move to another location in the stadium.

At a midpoint in the game, a player lost his grip on a bat. The record indicated that the bat flew a distance of about 120 feet along the third base line at a height of approximately six feet. The bat was airborne for two or three seconds before it struck Tara on the right side of her head. Prior to being struck by the bat, Tara had turned to talk to a friend.

At the time of the incident, no supervisors from the Department were in Tara's immediate vicinity. One supervisor who viewed the incident from a distance testified that an adult in the area could possibly have done something, either trying to knock down the bat or yelling for the kids to duck. Cynthia, at her deposition, however, testified that the incident could not have been avoided had an adult been in Tara's place.

Plaintiffs sued the City and a number of other defendants, including the baseball player involved and the teams playing the game. The plaintiffs' claims against the City sounded in negligence.

The City filed a motion for summary judgment asserting that the permission slip constituted a waiver of the plaintiffs' claims and that, in

any event, the plaintiffs could not show a breach of any duty of care owed by the City. With respect to the permission slip, the City noted that the language specifically states that a parent realizes that the "Bettendorf Park Board is not responsible or liable for any accidents or injuries that may occur while on this special occasion" and that "[f]ailure to sign this release" is "grounds for denial of participation." On the issue of breach of duty, the City argued that there was nothing that the City should have done to avoid the accident.

Plaintiffs resisted and filed a cross motion for summary judgment. On the issue of waiver, the plaintiffs contended that the permission slip did not amount to a valid anticipatory release of future claims based upon the City's negligent acts or omissions. The plaintiffs further argued that even if the permission slip amounted to a valid release, it was fatally flawed because it purported to release only the Department and not the City. Finally, plaintiffs asserted even if the permission slip amounted to an anticipatory release of future claims based on acts or omissions of negligence, statutory and common law public policy prevents a parent from waiving such claims on behalf of a minor child.

In resisting the City's motion for summary judgment based upon the lack of a breach of duty, the plaintiffs, in addition to testimony of lay witnesses, offered a report from Susan Hudson, a professor at the University of Northern Iowa and an expert on playground and park safety. Based on her review, Hudson found that the Department breached its duty of care toward the plaintiffs in several ways. Hudson opined that the Department breached its duty of care by: (1) not informing the Sweeneys about the nature of possible harm even though Cynthia personally inquired about the nature of the activity; (2) not anticipating the known and foreseeable harm that could occur by not

paying attention to the selection of seating; (3) not providing direct instructions to the children about paying attention to the possibility of bats and balls flying into the bleacher area; and (4) not providing direct supervision for children under their care.

The district court granted the City's motion for summary judgment. The district court found that the permission slip constituted a valid waiver of plaintiffs' claims. In the alternative, the district court found that the plaintiffs did not present sufficient evidence to establish a breach of duty owed to them. Plaintiffs appealed.

## II. Direct vs. Interlocutory Appeal.

At the outset, there is a question of whether this case presents a direct appeal or is interlocutory in nature. A direct appeal is heard as a matter of right, while this court has broad discretion to consider whether to hear an interlocutory appeal. Iowa R. App. P. 6.1(*c*). The central issue is whether an appeal of a district court order which dismisses all claims against one party in a negligence action involving multiple defendants is direct or interlocutory.

In *Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732 (Iowa 2008), we considered this question. In *Buechel*, we noted that under our comparative fault statute, fault sharing cannot occur with a defendant who is no longer a party to the litigation through grant of summary judgment. *Buechel*, 745 N.W.2d at 735; *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 863 (Iowa 1994). As a result, the issues in the motion for summary judgment had impact on the issues of liability against the remaining defendants, are not severable, and are therefore interlocutory in nature. *Buechel*, 745 N.W.2d at 735. Nonetheless, as in *Buechel*, we exercise our discretion to treat the notice

of appeal here as an application for interlocutory appeal, grant the application, and consider the underlying merits. *Id.* at 736.

### III. Standard of Review.

We review a district court's order on a motion for summary judgment for correction of errors at law. *Ratcliff v. Graether,* 697 N.W.2d 119, 123 (Iowa 2005). Summary judgment is appropriate when the moving party shows there is no genuine issue of material fact. *Berte v. Bode,* 692 N.W.2d 368, 370 (Iowa 2005). Summary judgment should not be granted if reasonable minds can differ on how a material factual issue should be resolved. *Walker v. Gribble,* 689 N.W.2d 104, 108 (Iowa 2004).

### IV. Discussion.

**A. Permission Slip as Anticipatory Release of Claims of Negligence.** This case involves an exculpatory provision contained in a permission slip signed by the parent of a minor child in connection with recreational activities sponsored by a municipality.[1] The validity of exculpatory provisions which release future claims in connection with recreational activities is a topic that has been thoroughly explored in the academic literature. *See, e.g.,* Mary Ann Connell & Frederick G. Savage, *Releases: Is There Still a Place for Their Use by Colleges & Universities?,* 29 J.C. & U.L. 579 (2003); Mark Seiberling, *"Icing" on the Cake: Allowing Amateur Athletic Promoters to Escape Liability in* Mohney v. USA Hockey, Inc., 9 Vill. Sports & Ent. L.J. 417 (2002). The academic commentators note courts considering such exculpatory provisions deal with the

---

[1]While many cases appear to use the terms interchangeably, an exculpatory provision is similar but not identical to an indemnity provision. An indemnity provision ordinarily allocates risks of third party losses among parties to a contract. In an indemnity context, at least one party remains liable for the third party losses. The victim thus still has a source of recovery. An exculpatory provision, however, does not allocate risk between responsible parties but eliminates liability all together. Cathleen M. Devlin, *Indemnity & Exculpation: Circle of Confusion in the Courts,* 33 Emory L.J. 135, 170–71 (1984).

inherent tensions between the law of torts, which generally requires parties to be responsible for their acts of negligence, and the law of contracts, which allows a competent party to make his or her own agreements. Connell & Savage, 29 J.C. & U.L. at 580; Seiberling, 9 Vill. Sports & Ent. L.J. at 428.

The early Iowa cases dealing with exculpatory provisions involve real estate contracts. As early as 1921, we considered the effect of a provision in a real estate lease that provided that in no case should the lessor be liable for damage to the property. *Oscar Ruff Drug Co. v. W. Iowa Co.*, 191 Iowa 1035, 181 N.W. 408 (1921). Among other things, we noted that the clause in the lease was couched in general terms and did not specifically exempt the lessor from liability for its own negligent acts. *Id.* at 1042, 181 N.W. at 411. As a result, we held that the lease did not release the lessor from damages resulting from the lessor's own negligence. *Id.* at 1043, 181 N.W. at 412.

More than thirty-five years later, we considered the effect of provisions in a real estate lease which the tenant claimed relieved the tenant from liability for a fire that was allegedly caused by its own negligence. *Sears, Roebuck & Co. v. Poling*, 248 Iowa 582, 81 N.W.2d 462 (1957). The lease in *Sears*, among other things, obligated the tenant to keep the premises in good condition, "loss by fire . . . excepted." *Id.* at 586, 81 N.W.2d at 464. While this contractual provision might have had a bearing on fire losses not caused by the tenant's negligence, we held that the general exculpatory language did not immunize the tenant from liability for damage to the landlord's premises caused by its own negligence. *Id.* at 589, 81 N.W.2d at 466. In reaching this determination, we cited with approval an annotation stating that "broad exculpatory provisions" would rarely immunize a defendant for acts of

affirmative negligence. *Id.* at 588, 81 N.W.2d at 465 (citation omitted). We further cited with approval *Oscar Ruff Drug* and cases from other jurisdictions holding that contract provisions will not be held to relieve a party of liability for its own negligence unless the intention to do so is clearly expressed. *Id.* at 591–92, 81 N.W.2d at 467–68; *see Oscar Ruff Drug*, 191 Iowa at 1035, 181 N.W.2d at 408; *see also Fields v. City of Oakland*, 291 P.2d 145, 149 (Cal. Ct. App. 1955); *Winkler v. Appalachian Amusement Co.*, 79 S.E.2d 185, 190 (N.C. 1953); *Carstens v. W. Pipe & Steel Co.*, 252 P. 939, 941 (Wash. 1927).

Following *Sears*, we decided *Baker v. Stewarts' Inc.*, 433 N.W.2d 706 (Iowa 1988), a case outside the real estate setting. In *Baker*, we considered the validity of a document signed by a plaintiff who claimed that hair straightening products applied to her scalp at a cosmetology school produced subsequent baldness. *Baker*, 433 N.W.2d at 707. The document stated in relevant part, "I will not hold the Stewart School, its management, owners, agents, or students liable for any damage or injury, should any result from this service." *Id.*

In *Baker*, we held that this document did not amount to an anticipatory release of future claims based upon negligent acts or omissions of the professional staff of a cosmetology school because a release of such claims would not be apparent to a casual reader. *Id.* at 709. We cited *Sears* and dicta in the indemnity case of *Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 916–17 (Iowa 1975), for the proposition that general exculpatory provisions do not cover the negligence of a party unless the intention to do so is clearly expressed. *Id.* In other words, the general exculpatory provision in *Baker*, which stated that the customer would not hold "management, owners, agents or students liable for any

damage or injury," was insufficient to release the defendant from liability for the negligent acts of its professional staff. *Id.*

In contrast, in *Huber v. Hovey*, 501 N.W.2d 53, 56 (Iowa 1993), we held that a document signed by a spectator to an auto race did amount to an enforceable anticipatory release of future claims based on negligent acts or omissions of a party. In *Huber*, the document in question emphasized that it was a "covenant not to sue" and that it "releases" the promoter "from all liability . . . [for] all loss or damage, and any claim . . . on account of injury . . . whether caused by the negligence of the releasees or otherwise. . . ." 501 N.W.2d at 54. We distinguished this language from the sort utilized in *Baker*, noting that the document specifically indicated that it was a release of claims caused by the negligence of one of the parties. *Id.* at 56; *see also Grabill v. Adams County Fair & Racing Ass'n*, 666 N.W.2d 592 (Iowa 2003).

The permission slip in this case is much closer to the document in *Baker* than in *Huber*. As in *Baker*, the permission slip contains no clear and unequivocal language that would notify a casual reader that by signing the document, a parent would be waiving all claims relating to future acts or omissions of negligence by the City. *Baker*, 433 N.W.2d at 707. The language at issue here refers only to "accidents" generally and contains nothing specifically indicating that a parent would be waiving potential claims for the City's negligence. *See Alliant Energy-Interstate Power & Light Co. v. Duckett*, 732 N.W.2d 869, 878 (Iowa 2007) (holding a utility tariff that released utility from "all claims, demands, costs, or expenses for injury . . . or damage" was not sufficient to release utility from its own negligent acts). As noted in a recent best seller, the term "accident" normally means "unpreventable random occurrences." *See* Marc Gernstein with Michael Ellsberg, *Flirting with Disaster: Why*

*Accidents are Rarely Accidental* 3 (2008). The general language in this permission slip simply does not meet the demanding legal standards of our Iowa cases.

While we have not previously considered the effect of exculpatory provisions in the specific context of sponsored recreational activities, we see no basis for departing from the *Baker-Huber* principles in this context. The cases from other jurisdictions demonstrate the reluctance of courts to provide defendants who sponsor recreational activities a more lenient framework for analyzing exculpatory clauses seeking to limit liability for the sponsors' own negligence. Several state courts in a recreational context have adhered to a bright-line test, requiring that the specific words negligence or fault be expressly used if an exculpatory provision is to relieve a defendant from liability for its own negligent acts or omissions. *See Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 337 (Mo. 1996) (noting general exculpatory language releasing "any . . . injuries" and "all claims" does not suffice to release party of its own negligence, because such language creates a latent ambiguity in exculpatory contracts); *Geise v. Niagara County*, 458 N.Y.S.2d 162, 164 (Sup. Ct. 1983) (holding words "fault" or "neglect" must be used to bar claim for party's own negligence).

Other courts in the context of recreational activities have not required magic words, but have imposed a demanding requirement that the intention to exclude liability for acts and omissions of a party must be expressed in clear terms. *Sirek v. Fairfield Snowbowl, Inc.*, 800 P.2d 1291, 1295 (Ariz. Ct. App. 1990) (requiring intention to immunize for negligent acts be clearly and explicitly stated); *Turnbough v. Ladner*, 754 So. 2d 467, 470 (Miss. 1999) (finding general exculpatory provision inadequate and noting release of acts of a party's own negligence must be

expressed in "specific and unmistakable terms"); *Gross v. Sweet*, 400 N.E.2d 306, 309–10 (N.Y. 1979) (noting that while the word "negligence" need not specifically be used, words conveying a similar import must appear).[2]  The approach of these cases is consistent with the approach in Iowa exculpatory clause cases generally.  *See Baker*, 433 N.W.2d at 709 (requiring a clear and unequivocal expression).  We see no reason to relax from the approach in *Baker* merely because this case involves a recreational activity.

In looking at cases involving recreational activities, language similar to that used by the City in this case has been found insufficient to support a release of a party's own negligence.  For example, in *Doyle v. Bowdoin College*, 403 A.2d 1206, 1208 (Me. 1979), the court found the use of the term "accidents" insufficient to provide a basis for release from a party's own negligence.  *See* Hroblak, 27 U. Balt. L. Rev. at 471 (noting drafter should not seek to release party from any "accidents" because the term is ambiguous and insufficient to release own negligent acts); *see also O'Connell v. Walt Disney World Co.*, 413 So. 2d 444, 446–47 (Fla. Dist. Ct. App. 1982) (finding language stating company held harmless from liability and from risks inherent in riding activity not sufficient to release its own negligence); *Calarco v. YMCA of Greater Metro. Chicago*, 501 N.E.2d 268, 272–73 (Ill. App. Ct. 1986) (holding provision to hold

---

[2]Even in these jurisdictions, the better practice is to expressly use the term "negligence" in the exculpatory agreement.  *See Swartzentruber v. Wee-K Corp.*, 690 N.E.2d 941, 945 (Ohio Ct. App. 1997) (noting that the "better practice" would be to expressly include the word "negligence"); *Dobratz v. Thomson*, 468 N.W.2d 654, 663 (Wis. 1991) (refusing to adopt a magic words test, but noting the use of term "negligence" would be "very helpful"); *see also* Steven B. Lesser, *How to Draft Exculpatory Clauses That Limit or Extinguish Liability*, 75 Fla. B.J. 10, 14 (Nov. 2001) (noting from a practical standpoint, utilization of the word "negligence" should increase the likelihood of enforcement); Kevin G. Hroblak, Adloo v. H.T. Brown Real Estate, Inc.: *"Caveat Exculpator"—An Exculpatory Clause May Not Be Effective Under Maryland's Heightened Level of Scrutiny*, 27 U. Balt. L. Rev. 439, 469 (1998) (noting a risk adverse drafter should use the word "negligence" in all exculpatory clauses).

YMCA "free from any and all liability" and discharging "any and all rights and claims for damages" not sufficient to relieve YMCA of liability for its own negligence).

For the reasons expressed above, we hold that the language in the permission slip in this case does not constitute an enforceable anticipatory release of claims against the City for its negligent acts or omissions in connection with the field trip.[3]

**B. Application of Inherent Risk Doctrine to Defeat Negligent Supervision Claim.** The City, while acknowledging that it owed Tara a duty of care, seeks to limit that duty through the application of the inherent risk doctrine. The City claims that the risk of being injured by flying bats and balls when seated outside screening is unavoidable as it is an inherent part of attending a baseball game. As a result, the City claims, it had no duty to protect Tara from the subsequent injuries. The question of the proper scope of legal duty is a question of law to be determined by the court. *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999); *Leonard v. State*, 491 N.W.2d 508, 511–12 (Iowa 1992).

---

[3]As a result of our disposition of the release issue, we do not consider four other arguments advanced by the plaintiffs. First, we do not consider whether the failure to specifically name the City in the release prevents its enforcement by the City. Second, we also do not address the question of whether a parent may release the claims of a minor for the negligent acts or omissions of a sponsor of recreational events. The case law from other jurisdictions is divided on this issue. *Compare Hojnowski v. Vans Skate Park*, 901 A.2d 381, 389–90 (N.J. 2006), *with Zivich v. Mentor Soccer Club, Inc.*, 696 N.E.2d 201, 205 (Ohio 1998). *See generally* Doyice J. Cotten, Sarah J. Young, & Sport Risk Consulting, *Effectiveness of Parental Waivers, Parental Indemnification Agreements, & Parental Arbitration Agreements as Risk Management Tools*, 17 J. Legal Aspects Sport 53 (2007). Third, we do not consider the implications on this case, if any, of Iowa Code section 599.2 (2003), which allows a minor to disaffirm contracts with certain exceptions. Fourth, we do not consider the general question of whether public policy voids a contract provision releasing claims of negligence under the circumstances presented here. *See Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 446–47 (Cal. 1963).

In support of its position, the City cites *Anderson v. Webster City Community School District,* 620 N.W.2d 263 (Iowa 2000). In *Anderson,* a seven-year-old boy broke his leg while sledding during a noon recess at his elementary school. *Anderson,* 620 N.W.2d at 265. The jury instruction in that case noted that some risks naturally attend participation in recreational activities and that the sponsor has a duty only to protect a participant from unreasonable risks of harm. *Id.* at 266. The *Anderson* court noted that the instruction was similar to the "primary assumption of risk doctrine" which, while no longer utilized in Iowa, was an alternative expression for the proposition that a defendant is not negligent or owed no duty for risks inherent in certain activities. *Id.* at 267.

The City also cites *Dudley v. William Penn College,* 219 N.W.2d 484 (Iowa 1974), in support of its motion for summary judgment. In *Dudley,* a plaintiff baseball player, who was hit by a foul ball, claimed that the college should have had dugouts or netting protecting the participants from the playing field. *Dudley,* 219 N.W.2d at 485. We rejected that claim, noting that the duty that was owed extended only to those risks that were unreasonable. *Id.* at 486–87. "[P]layers in athletic events accept the hazards which normally attend the sport." *Id.* at 486. As a result, we held that the injured player did not have a cause of action against the coach and college. *Id.* at 487. In sum, the City argues that it did not breach its duty of care because being struck by a bat is an inherent risk of attending a minor league baseball game.

Plaintiffs view the case differently. They distinguish *Anderson* on the ground that the City had a much greater control over the activities of the children in this case. They note that the City determined that Tara would sit on bleachers unprotected by screening and that the City chose

not to follow accepted recreational and leisure standards for the proper safety and supervision of children by failing to ensure direct supervision and by failing to warn them and their parents of the danger of flying bats when sitting in unprotected areas. The plaintiffs further note that in *Anderson,* whether the defendants unreasonably failed to protect the plaintiff was a question for the jury to decide.

The plaintiffs assert *Dudley* is inapposite. They see *Dudley* as a variant of the limited liability rule which relieves baseball park owner-operators of responsibility for flying objects. Here, however, the question on appeal relates not to the duty of the owner-operator of a baseball facility, but to the duty of the City to properly supervise Tara while attending the game. The City, plaintiffs argue, directed Tara to sit in an unprotected area and then did not provide adequate direct supervision in that area. Further, plaintiffs argue that their expert provided a sufficient basis for a jury to determine that the City acted unreasonably under all the facts and circumstances.

In the majority of cases, spectators sitting outside protective netting at baseball stadiums have been unable to recover from owners or operators for injuries related to errant bats and balls on the ground that such injuries were an "inherent risk" of attending the game. *See generally* James L. Rigelhaupt, Jr., Annotation, *Liability to Spectator at Baseball Game Who is Hit by Ball or Injured as Result of Other Hazards of Game,* 91 A.L.R.3d 24 (1979). Claims against owners or operators for injuries incurred by flying bats and balls that have been decided after the movement toward comparative negligence tend to characterize nonliability as based on a "limited duty" theory. *See, e.g., Vines v. Birmingham Baseball Club, Inc.,* 450 So. 2d 455, 456 (Ala. 1984) (Torbert, C.J., concurring specially); *Lawson v. Salt Lake Trappers, Inc.,* 901 P.2d

1013, 1015–16 (Utah 1995); *Perez v. McConkey*, 872 S.W.2d 897, 900 (Tenn. 1994); Daniel E. Wanat, *Torts and Sporting Events: Spectator and Participant Injuries—Using Defendant's Duty to Limit Liability as an Alternative to the Defense of Primary Implied Assumption of Risk*, 31 U. Mem. L. Rev. 237 (2001).

Regardless of whether the approach is characterized as involving inherent risk or a limited duty, courts applying the doctrine have held that the owner or operator of a baseball stadium is not liable for injury to spectators from flying bats and balls if the owner or operator provided screened seating sufficient for spectators who may be reasonably anticipated to desire such protection and if the most dangerous areas of the stands, ordinarily the area behind home plate, were so protected. *Quinn v. Recreation Park Ass'n*, 46 P.2d 144, 146 (Cal. 1935); *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 533–34 (N.Y. 1981). In *Arnold v. City of Cedar Rapids*, 443 N.W.2d 332, 333 (Iowa 1989), we adopted a version of the limited duty rule in a premises liability case with respect to misthrown balls.[4]

---

[4]There has been some resistance to inherent risk or the limited duty doctrine. For example, Professor James noted long ago that the primary assumption of risk doctrine, of which the limited duty rule is a variant, provides "an exceptional curtailment of defendant's duty below the generally prevailing one to take care to conduct oneself so as not to cause unreasonable danger to others." Fleming James, Jr., *Assumption of Risk*, 61 Yale L. J. 141, 168 (1952). More recently, a few judges have directly challenged the limited duty rule. *See Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 881 A.2d 700, 710–13 (N.J. 2005) (Wallace, J., concurring), *superseded by statute*, New Jersey Baseball Spectator Safety Act of 2006, N.J. Stat. Ann. § 2A:53A-43-48 (2006); *Akins*, 424 N.E.2d at 536 (Cooke, J., dissenting). There appears to be a move within the legal profession away from the rule. *See* Restatement (Third) of Torts: Apportionment of Liability § 3 cmt. *c*, illus. 6, at 32–33 (2000) (replacing limited duty with comparative fault in cases involving injury to baseball spectators). In addition, recent academic commentary has challenged the doctrine. David Horton, *Rethinking Assumption of Risk & Sports Spectators*, 51 UCLA L. Rev. 339, 366 (2003) (noting increasingly hazardous nature of stadium seating in light of increased pitching speeds, greater batting capability, and stadium design that places patrons in a zone of danger); Gil Fried & Robin Ammon, *Baseball Spectators' Assumption of Risk: Is it "Fair" or "Foul"?*, 13 Marq. Sports L. Rev. 39, 61 (2002) (same).

This case, however, does not involve a premises liability claim against the owner or operator of a baseball stadium. Instead, the issue is whether the district court erred in granting summary judgment in a negligent supervision case against the City based on its view that the injury was due to "an inherent risk in attending the baseball game."

We conclude that the district court erred in granting summary judgment based on inherent risk. A negligent supervision case is fundamentally different than a case involving premises liability. The eight-year-old child in this case made no choice, but instead sat where she was told by the Department. The plaintiffs further claim that there was inadequate adult supervision where the child was seated. The alleged negligence in this case does not relate to the instrumentality of the injury, but instead focuses on the proper care and supervision of children in an admittedly risky environment. *See, e.g., Stanley v. Bd. of Educ.*, 293 N.E.2d 417, 422 (Ill. App. Ct. 1973) (holding alleged negligent supervision of children in thrown bat case raises jury question in light of expert opinion); *Cook v. Smith*, 33 S.W.3d 548, 553–54 (Mo. Ct. App. 2000) (noting acceptance of custody and care of minor child creates duty of care independent of premises liability); *Havens v. Kling*, 277 A.D.2d 1017, 1018 (N.Y. App. Div. 2000) (holding parents of eleven-year-old inexperienced golfer did not have claim against twelve-year-old golfer who hit son on the head with club, but did have claim against golf shop and event sponsor for negligent supervision); *Gordon v. Deer Park Sch. Dist. No. 414*, 426 P.2d 824, 828 (Wash. 1967) (finding possible negligence claim where bat slips from hands of teacher).

---

There is no occasion on this appeal to revisit the application of inherent risk or limited duty doctrine in the context of a premises liability claim.

Viewed as a negligent supervision case, the City had a duty to act reasonably, under all the facts and circumstances, to protect the children's safety at the ball park. *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.,* 617 N.W.2d 11, 16–17 (Iowa 2000). The gist of the plaintiffs' claim is that a substantial cause of the injury was the supervisors' decision to allow the children, who cannot be expected to be vigilant at all times during a baseball game, to be seated in what a jury could conclude was an unreasonably hazardous location behind third base instead of behind the safety of protective netting. From this perspective, the inevitable exposure of the children to flying balls and bats that arises from sitting outside the range of protective netting does not provide a complete defense, but instead is a factor for a jury to consider in determining whether the acts and omissions of the supervisors were reasonable under all the facts and circumstances. As in *Anderson,* moreover, whether a defendant has breached its duty of care under all the circumstances is ordinarily a jury question, particularly where the plaintiff has offered expert testimony indicating that the defendant did not follow customary practices for the safety of children when engaged in recreational activities. *Anderson,* 620 N.W.2d at 266–67.

As a result, the City is not entitled to summary judgment with respect to the specifications of negligence in the plaintiffs' expert report on the ground of "inherent risk" or the "limited duty doctrine." The extent to which an injured party knowingly engages in risky behavior in a negligent supervision case is a factor for the fact finder to consider in the framework of comparative fault.

**C. Cause in Fact Challenge to Claim of Lack of Direct Supervision.** The City also advances an alternate argument in partial defense to some aspects of the plaintiffs' negligent supervision claim. To

the extent that the plaintiffs' case rested on the failure to have adult supervision in close proximity to Tara when the children were seated along the third base line, the City argued that such direct supervision would not have made a difference. The City's argument amounts to a claim that even if the City breached its duty toward Tara by not providing adequate adult supervision, that breach of duty was not the cause of Tara's injuries.

We have held that causation has two components: cause in fact and legal cause. *Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007). Cause in fact is a but-for test, while determination of legal or proximate cause reflects a policy judgment that the cause of the accident is not so remote or attenuated that liability should not be imposed. *Id.* Ordinarily, determination of cause in fact is a question for the fact finder to determine. *Id.*

Conceding for purposes of summary judgment that the City had a legal duty to reasonably supervise its charges, and further assuming that the City breached its duty of reasonable care by failing to provide direct supervision to the children in a ratio of one adult for ten children as suggested by plaintiffs' expert, the alleged breach of duty cannot satisfy the "but-for" element of proximate cause for Tara's injuries as a matter of law. Although whether a breach of duty was a cause in fact of injuries sustained by the plaintiff is ordinarily a fact question, the evidence in this case, even when viewed in the light most favorable to the plaintiff, does not establish a triable issue.

In order to establish cause in fact, the plaintiff need not show certainty or inevitability, but the plaintiff must offer something beyond mere conjecture and speculation. *Easton v. Howard,* 751 N.W.2d 1, 6 (Iowa 2008) (quoting *George v. Iowa & S.W. Ry. Co.,* 183 Iowa 994, 997–

98, 168 N.W. 322, 323 (1918)). A plaintiff must offer sufficient evidence for a fact finder to conclude by a preponderance of evidence that the injuries that occurred would likely have been avoided absent the breach of duty. Mere guesswork about what might have occurred is not enough.

Here, the evidence simply is not sufficient to allow a reasonable fact finder to conclude that in all likelihood the injuries to Tara would have been avoided if the City would have provided the direct adult supervision as urged by plaintiffs' expert. Even if the City provided direct supervision in the ratio of one adult for every ten children, there no is reason to believe that an adult supervisor would likely have been able to knock down the bat or warn Tara effectively to avoid injury.

In order to block the flying bat, the supervisor would have had to have seen the bat leave the hands of the batter and would have had to have sufficient presence and verve to thrust himself or herself into harm's way to knock down the projectile. This scenario is improbable enough, but there is also no reason to believe that a supervisor would have been sitting in sufficiently close proximity to be physically able to knock down the bat. In short, the City could have met the plaintiffs' expert's standard for direct supervision without affecting the outcome of this tragic affair.

Perhaps realizing the difficulties of persuading a fact finder that a fortuitous courageous block would have occurred but for the breach of duty, the plaintiffs fall back on a warning theory. While an adult seated in the vicinity of Tara would have been in a position to provide a louder and more direct warning to her than a supervisor at a greater distance, a reasonable fact finder could not conclude that the accident would have likely been avoided if there was direct supervision as suggested by plaintiffs' expert. The errant bat in this case did not fly like a helicopter

seed dropping from some tree, but rapidly ripped through the air at a low elevation to its unhappy destination. Under these facts, it is anyone's guess as to whether a sharp verbal warning, even if immediately given, would have done the job. We therefore hold that plaintiffs have failed to generate a fact question on the proposition that enhanced direct supervision would have provided sufficient warning to Tara to avoid the injuries.

Our ruling on the issue of cause in fact is consistent with the case law in a number of other jurisdictions that have considered the issue in the context of flying balls and bats.[5] Further, our decision, though disappointing perhaps, will not come as a total shock to the plaintiffs. Tara's mother testified in this case that there was nothing a supervisor sitting in the vicinity could have done to avoid Tara's injuries. We do not regard Tara's mother's testimony as a binding admission, but the observation is obviously consistent with our conclusion that the evidence does not establish a triable issue of cause in fact on the ground of lack of direct supervision. *Cf. Meyer v. Mulligan*, 889 P.2d 509, 516 (Wyo. 1995) (noting that lay people are generally not competent to pass judgment on legal questions, including cause).

**V. Conclusion.**

The permission slip in this case did not release the City from alleged acts of future negligence. Further, the doctrine of inherent risk does not provide a basis to defeat the plaintiffs' theories of negligence in this case. To the extent the plaintiffs argue that the City breached its duty of care by failing to provide direct supervision to the children once

---

[5]*See, e.g., Benedetto v. Travelers Ins. Co.,* 172 So. 2d 354, 355 (La. Ct. App. 1965) (finding no amount of supervision could have altered manner in which bat was thrown); *Lang v. Amateur Softball Ass'n of Am.,* 520 P.2d 659, 662 (Okla. 1974) (finding no triable issue in wild pitch case where it was not reasonably apparent that injuries suffered were caused by wrongful act).

they were seated along the third base line at the ball park, we conclude that the plaintiffs failed as a matter of law to adduce sufficient evidence to raise a triable issue.  To this extent, the City is entitled to summary judgment in this case.  As a result, the district court's grant of summary judgment is affirmed in part and reversed in part.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Cady, J., who dissents and Streit, J., who concurs in part and dissents in part.

#112/07–0127, *Sweeney v. Bettendorf Parks & Recreation Dep't*

**CADY, Justice (dissenting).**

I respectfully dissent. My departure from the decision of the majority is based on two principal reasons, both tied by a common thread. This common thread is woven with the clear understanding that a baseball game—America's pastime—presents a known, but acceptable, threat of harm to spectators. This threat, of course, comes from baseballs and, on very rare occasions, bats or broken pieces of bats that enter the spectator area from the playing area. While these objects become coveted possessions for spectators of all ages, they are at the same time an inherent danger of attending the game. This danger is the basis for the lawsuit in this case, which I believe should be thrown out by a call made with relative ease.

**I. Release of Liability.**

First, I believe the release of liability signed by the parents of the child hit by the baseball bat in this case was valid and prevents the parents from suing. The majority, of course, concludes the release was insufficient to cover the particular claim of negligent supervision brought against the city parks and recreation department, who organized the field trip to the ballgame. I agree the release would not cover the full range of injuries a child could reasonably be expected to encounter during a supervised field trip to a professional baseball park, but I believe it at least covered the very obvious and common danger associated with watching a baseball game—the very purpose of the field trip—that any reasonable parent would have understood and contemplated when deciding to permit their child to attend a baseball game.

The majority seems to construct a rule that invalidates all but the most sophisticated and carefully drawn releases by focusing on the

general principle of law that agreements to release a party from liability for his or her own negligence are disfavored. Yet, this broad principle is not a working rule of law and has given way to the more pragmatic, specific rule that a release must clearly identify to a casual reader those claims or injuries covered under the release. *Baker v. Stewarts' Inc.*, 433 N.W.2d 706, 709 (Iowa 1988). Importantly, a release does not need to specifically mention a party's "own negligence" to be valid. In proper context, most releases could only have meaning as applied to common claims of negligence. Instead, the inclusion of such language merely helps remove any doubt that the release intended to cover any circumstance under the umbrella of negligence. Yet, the critical inquiry is whether the incident claimed to be covered under the release was unambiguously identified to a casual reader.

For example, in *Baker* a release of "liability for any damage or injury" between a cosmetology school and a patron of services performed by students at the school did not cover an injury to the hair and scalp of the patron that was the subject of a negligence claim for liability against the professional staff who supervised the student services. *Id.* The language of the release failed to "clearly and unequivocally" express to a casual reader of the release that it included professional staff in the release of liability. *Id.* We did not totally invalidate the release as too vague due to the absence of any specific mention of negligence, but only found the language of the release was not broad enough to include professional staff. *Id.* A patron of the cosmetology school would not understand that he or she was releasing the professional staff from liability by casually reading the release. *Id.* Similarly, in *Huber v. Hovey*, 501 N.W.2d 53, 54 (Iowa 1993), we were presented with a release of "all liability" for any claim of injury "whether caused by the negligence of the

releasees or otherwise." The release was between a racetrack and spectators who entered the pit area of the racetrack, and we found the release did cover a spectator who entered the pit area and was injured when a wheel of a race car came off and struck the spectator. *Id.* at 56–57. In response to the argument that the language of the release did not sufficiently identify the accident, we found the release covered the claim because it clearly identified the parties to the release, including spectators who entered the pit area, and clearly covered personal injuries to spectators who entered the pit area. *Id.* Under the circumstances, a casual signer of the racetrack release would understand that the injuries referred to in the release included injuries associated with car racing that could be expected to occur in the pit area. We did mention the release specifically covered injuries caused by the track's own negligence, but only to further clarify that the release covered a broad range of personal injuries to spectators. The use of the term "negligence" in the release only helped clarify the broad type of injuries covered. It was not a predicate to covering any injury.

Overall, the *Baker-Hovey* approach considers the context and subject of a release between the parties and the language expressed in the release and looks to consider whether a casual signer would understand the injury or incident at issue was unambiguously covered. In this case, the language of the release may not cover a broad range of injuries that could be sustained by children who go on a field trip to a baseball park. For example, the release did not express the notion that injuries during the transportation of the children would be covered. The subject of the release was a baseball game, and a parent signing the release would likely not have transportation in mind without some specific identification or reference to the transportation component of the

field trip. However, the release did have meaning, and that meaning was the city would at least not be liable for those inherent injuries known to occur to spectators of a baseball game—the subject of the release. The release clearly identified the baseball stadium as the subject of the trip and stated the city would not be "liable for any accidents." At a minimum, any parent signing the release would understand that those accidents known to occur to spectators were contemplated under the release of liability.

## II. No Duty of Care.

There is a second, more fundamental, reason the case should be dismissed. This reason is the city had no duty to protect the children at the baseball park from the inherent risks of the game of baseball as the children sat in their seats watching the game being played.

I completely agree the city had a duty to supervise the children throughout the field trip and to generally protect the children from reasonably foreseeable harm. However, the creation of a duty of care and the scope of the duty created are always questions of law. Courts have drawn a line on the scope of a duty of care to protect spectators of a baseball game at a baseball park. That line is roughly drawn in an area behind home plate. This area is where spectators need the most protection from foul balls, or perhaps an occasional wild throw. Protection is most needed in this area because the risk of harm to spectators is most foreseeable in this area of a baseball park. Thus, courts have consistently imposed a duty of care on baseball parks to protect spectators from balls entering the spectator area, and baseball parks have responded to this duty by installing protective netting in the area behind home plate.

Of course, protective netting could easily be installed around the entire perimeter of the playing field, which would provide a consistent level of full protection for all spectators in all areas of the baseball park. Yet, courts have almost universally rejected such a notion as a legal duty, driven largely by public policy, which is normally a major component in deciding to create any duty of care. Thus, baseball parks have only a limited duty to spectators, and this duty is to protect spectators behind the area of home plate from foul balls. There is no duty to protect spectators in other areas of the baseball park, even though a foreseeable risk of harm continues to exist for spectators. Yet, this gap in protection comes into play due to public policy. Spectators want some limited protection from the inherent risks of attending a baseball game, but they also attend the game for the chance to catch a foul ball or a home run ball. This is a time-honored tradition, deeply imbedded into the game itself and the American culture. It is as much a part of the game as the game itself and has become an inherent but acceptable danger for spectators.

The majority throws a knuckleball in an effort to dance around this culture and the supporting legal principles by relying on the general duty of supervision as a separate, more demanding area of tort law. It holds that supervisors of children have a greater duty of care to protect child spectators from the inherent risks of watching a baseball game than the owner of the ballpark by requiring adult supervisors to place children in seats that are reasonably protected from the inherent risks. Put another way, the majority essentially declares an adult supervisor can commit negligence by allowing a child to sit in an area of the ballpark outside the

protective netting.[6] This approach by the majority is scuffed and flawed. Most noticeably, it has no support in the application of the factors that go into the imposition of any duty of care and is detached from the traditions and expectations of the game of baseball.

At the outset, it must be acknowledged that, from a legal standpoint, this case is not merely about a flying bat. If it was, there could be no liability imposed on the city park and recreation department because a flying bat is too unforeseeable to give rise to a legal duty of care to protect a spectator. That is, it is not reasonably foreseeable to spectators that a flying bat will leave the playing field of a baseball park and enter the spectator area, especially an area thirty feet beyond third base. While the field trip organizers were charged with the responsibility to protect the children during the trip, a flying bat could not have been reasonably anticipated by the trip organizers as a potential harm to the children as they sat in the area of the ballpark beyond third base. Even on those rare occasions when a bat slips from the hands of a batter while

---

[6]It might be argued that the majority does not actually hold children must be seated behind the netting, but instead could be seated in those areas unprotected by netting that are not unreasonably exposed to the inherent risks of the sudden presence of flying objects. In other words, the majority believes the area of Tara's seat in this case—thirty feet beyond third base, three or four rows into the spectator area—was an "unnecessarily hazardous location." There was, of course, no evidence to support such a proposition, and such a proposition is contrary to the accepted configuration of a baseball stadium. This configuration recognizes the unreasonably hazardous area is behind home plate, which supports a duty of the owner of the ballpark to install protective netting around the area of home plate. Moreover, any spectator who has attended a professional baseball game or two knows that a sharply hit line drive off the bat of a professional baseball player that hooks foul can make any spectator location in the path of the ball, for a split second, hazardous. This hazard is the same whether a spectator is seated thirty feet beyond third base, 130 feet beyond third base, or even 230 feet beyond third base. It is simply of no avail to attempt to distinguish between areas of reasonable hazards outside the area protected by netting and areas of unreasonable hazards outside the area protected by netting. Spectators at a professional baseball game are exposed to inherent dangers most anywhere outside the area protected by netting, and it is a danger society has chosen, until this case, to accept.

attempting to hit a pitched ball, the bat will most likely travel in the direction of the playing field, not 120 feet into the spectator area. It is an extremely rare event for spectators outside the playing area to be placed in the zone of danger of a flying bat, especially a spectator located 120 feet down the third base spectator area. Consequently, no duty of care could be imposed to protect another against such specific, remote harm.

Nevertheless, the law does not impose a duty of care based on the foreseeability of a specific means of injury. *See Nachazel v. Miraco Mfg.*, 432 N.W.2d 158, 160 (Iowa 1988) ("In negligence cases it is not necessary to a defendant's liability that the wrongdoer should have foreseen the extent of the harm or the manner in which it occurred, so long as the injuries are the natural, though not inevitable, result of the wrong."). Instead, only some type of injury must be foreseeable to give rise to a duty of care. In this case, the known danger is flying objects, which is nearly always a baseball. Thus, the duty of care imposed by the majority applies to all flying objects, including baseballs and flying bats. This means a supervisor must protect children from baseballs in the same way as flying bats. Accordingly, this is the duty imposed by the majority that I believe cannot withstand the scrutiny of the factors we rely upon in deciding to impose a duty of care on people, or the scope of such duty of care.

When courts step up to decide whether or not to establish a duty of care under a particular circumstance, three factors are primarily considered: (1) the relationship between the parties, (2) the reasonable foreseeability of harm, and (3) public policy concerns. *See Stotts v. Eveleth*, 688 N.W.2d 803, 810 (Iowa 2004). These are the same factors that were essentially applied by courts in creating the limited duty of care for baseball parks. Yet, the majority avoids any serious discussion

and analysis of these factors, but instead merely recognizes that premise liability law, which supports a limited duty of care, is different from supervision-liability law. The majority finds this difference justifies the imposition of a greater duty of care for supervisors to protect others from a premise-based harm than the entity responsible for the creation of the harm. The rationale for this finding is that the supervisor in this case "directed" the children to sit outside the area protected by the netting.

I agree a supervisor should have a continuing duty of care for the safety of children while at the ballpark to protect children from those foreseeable risks of harm that might be encountered from strangers, horseplay on the steps, or other such events, but not from the very risks unique to the game of baseball and those risks that our law has already decided do not need to be eliminated by the baseball parks. An analysis of the factors used to create a duty of care clearly supports this approach.

First, there is nothing particular about a relationship between a child spectator and an adult supervisor who accompanies the child to a baseball game that favors the imposition of liability. The relationship between parties is a factor in creating a duty of care because it often introduces special considerations that help support a duty, such as control by one party over the other party or special benefits derived by a party. As applied to a baseball game, this factor actually tends to support liability on the premise owner more than it does for liability of a supervisor. The premise owner has a contractual relationship with the spectator, primarily controls the designation of the area to sit, and receives a financial benefit. Moreover, the premise owner has the greatest practical ability to protect the spectator. For sure, the relationship between a supervisor of a field trip to a baseball game and a

participant on the field trip is also marked by control over the participant, but not the same type of control that relates to a reasonable and effective ability to provide protection from the inherent risks of watching the game. That is to say, the relationship does not easily transform into the ability of a supervisor to protect the child spectator from the inherent risks of the game.

The majority finds supervisors determine where children sit, but the baseball park ultimately controls the seating arrangement. Moreover, the seats around home base protected by netting are usually the most expensive seats and are normally reserved for season ticketholders. It is impractical to conclude the relationship between supervisors and children gave supervisors the ability to seat children behind the protective netting.

Second, the foreseeability of harm to child spectators in an unprotected area of the baseball park is the same, if not greater, for the owner of the premise as it is for supervisors of the spectators. The owner has considerably more knowledge of the baseball park and the dangerous areas of the park. A supervisor should be able to safely expect the most dangerous areas for flying objects have been covered by netting, allowing spectators to sit in unprotected areas that are less dangerous.

Third, and most important, the public policies that support limiting the duty of care to protect spectators from the inherent risks of watching baseball are the same under premise-liability law as under supervisor-liability law. These public-policy concerns have drawn the line, which leaves spectators unprotected except in an area behind home plate. In the other areas of the baseball park, the opportunity to catch or retrieve a foul ball has won out over the slight risk of harm presented to spectators. In other words, the known risk of harm is not unreasonable

under common, practical standards and policies society has embraced since the game was invented by Alexander Cartwright in 1845.[7]

Without examining these factors, the majority has changed the game for spectators who bring children to a baseball park to take in the joys of our national pastime. It does this by concluding children must not be exposed to the same inherent risks of attending a baseball game as unsupervised spectators, and by placing the responsibility for protecting children from the inherent risks of attending a baseball game on adults who accompany children to the game. This conclusion, at its core, can only be explained by policies of overprotectionism and the innate desire to remove children from all potential harm they might encounter in life. Yet, this goal can go too far and can end up depriving children of some of the most rewarding and beneficial experiences of their youth. This will be the likely result of the overprotective decision by the majority in this case.

With this decision, America's pastime risks becoming a different, or less frequent, event for children than enjoyed in the past. With the imposition of liability on supervisors and others who accompany children to a professional baseball game, the common field trip, as well as the simple pleasure of a parent accompanying a child and the child's friend to a baseball park, gives rise to new considerations that can only diminish enthusiasm for the trip. Court decisions can have vast consequences on our way of life, and a trip to the ballpark with children in tow may now need to be preceded by a trip to a lawyer's office to obtain a release containing all the essential legal language demanded by

---

[7]Alexander Cartwright is recognized as the inventor of modern baseball. He published the rules of baseball in 1845, and his team, the Knickerbocker Club of New York, played the first recorded baseball game in 1846.

the majority or be confined to the most expensive seats behind home base, safely protected from the excitement and anticipation of catching a foul ball.

Just as there was no joy in Mudville the day the mighty Casey struck out, there is no joy on this day around Iowa's ballparks.[8] The majority has taken a mighty swing at the correct result in this case and missed by a mile.

---

[8]The legendary baseball poem, "Casey at the Bat," was written by Ernest Lawrence Thayer, and first published in the *San Francisco Examiner* on June 3, 1888.

**STREIT, Justice (concurring in part and dissenting in part).**

I concur in the majority's opinion in regard to the release of liability signed by the parent of the child but join Justice Cady's dissent as to the duty of care.