# IN THE COURT OF APPEALS OF IOWA

No. 15-0525
Filed May 11, 2016

IN RE THE MARRIAGE OF JULIA HEATH-CLARK
AND RICHARD ALAN CLARK

Upon the Petition of
**JULIA HEATH-CLARK,**
        Petitioner-Appellee,

**And Concerning**
**RICHARD ALAN CLARK,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Husband appeals from the district court's denial of his petition for a declaratory order and his application for an order nunc pro tunc to amend the parties' qualified domestic relations order. **AFFIRMED.**

Kodi A. Brotherson of Becker & Brotherson Law Offices, Sac City, for appellant.

Thomas P. Graves of Graves Law Firm, P.C., Clive, for appellee.

Heard by Danilson, C.J., and Mullins and McDonald, JJ.

**MCDONALD, Judge.**

Richard Clark appeals from the district court's denial of his petition for a declaratory order and his application for an order nunc pro tunc to amend the parties' qualified domestic relations order (QDRO). Richard maintains the QDRO should be amended to reflect the intent of the parties at the time they entered the dissolution decree. Specifically, he contends the Iowa Public Employees' Retirement System ("IPERS") calculates retirement benefits in a way neither party expected or intended and, as a result, Julia Clark receives more of his retirement benefit than intended.

I.

Richard and Julia married on May 24, 1970. They dissolved their marriage by stipulated decree on September 23, 2002. In pertinent part, the decree provides:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that [Julia] shall receive a percentage of [Richard's] IPERS asset as set forth in the Qualified Domestic Relations Order which shall be entered subsequent to the entry of this Decree. In regards to the IPERS benefit of [Richard] to be received by [Julia], when the member elects a payment option for IPERS benefits pursuant to any Qualified Domestic Relations Order, that member shall select fifty percent (50%) of the payment option for the contingent annuitant/alternate payee. The alternate payee shall not now or in the future designate a successor alternate payee. This Court shall retain jurisdiction for the filing and implementation of the Qualified Domestic Relations Order.

The same day, a QDRO was entered to divide Richard's IPERS benefits. The QDRO provides:

> IPERS is directed to pay benefits to the Alternate Payee as a marital property settlement under the following formula: fifty percent (50%) of the gross monthly or lump sum benefit payable at the date of distribution to the Member multiplied by the "service factor." The

numerator of the service factor is the number of quarters covered during the marriage period of May 24, 1970 through the 23rd day of September, 2002, (the date of the filing of the Decree of Dissolution of Marriage), and the denominator is the Member's total quarters of service covered by IPERS and used in calculating the Member's benefit.

On May 19, 2014, Richard filed a petition for declaratory judgment and/or order nunc pro tunc, claiming the service factor was too large and, as a result, Julia was receiving a greater percentage of his IPERS benefit. Richard claimed the service factor was too large because IPERS caps the number of quarters used in calculating the member's benefit (the denominator) at 140, or thirty-five years, even though Richard worked 165 quarters of service covered by IPERS. He asked the district court to "affirmatively declare that the denominator in the . . . formula fraction is [165],[1] the total number of quarters [Richard] worked in IPERS-covered employment." Additionally, Richard asked the district court to enter an order nunc pro tunc "correcting the error in the Qualified Domestic Relations Order."

On July 17, 2014, Julia filed a motion for summary judgment and a resistance to Richard's petition. In it, Julia asserted declaratory relief was not proper because there was not a "legal issue between [Richard and her] which can be resolved between the parties. . . . He has brought this matter against the wrong party with whom he does not have an actual issue of controversy." Julia also asserted an order nunc pro tunc was not appropriate because the QDRO correctly expressed judicial intention as set forth in the decree. Lastly, Julia

---

[1] At the time of the petition, Richard had worked 164 quarters. He ultimately completed another quarter of work before retiring.

maintained the IPERS rule limiting the denominator to 140 quarters was "appropriate under Iowa jurisprudence."

The matter came to trial on September 19, 2014. The general counsel for IPERS testified the maximum number of quarters that could be used in calculating the member's benefit was 140. During cross-examination, IPERS' general counsel testified that, while the denominator of the fraction was set at 140 by statute, IPERS had no position about what percentage was to be used against the service factor and that it would accept a number other than fifty percent if that was what the judge determined to be appropriate.

The district court filed its order denying Richard's petition for declaratory judgment and application for order nunc pro tunc on December 4, 2014. In it, the court stated:

> In considering the intention of the court from 2002, the court in 2014 uses the decree, the QDRO, and the transcript from the hearing on May 29, 2002 to determine the intent of the court's order. There is no indication that the court had any intent other than to put into place the agreement of the parties. The parties entered a stipulation of their agreement on the record on the date of trial . . . . It is clear that the parties agreed to divide Richard's IPERS benefits pursuant to the *Benson* formula – the *Benson* formula was referenced on the transcript and the QDRO uses a formula consistent with *Benson*.
>     . . . .
>     While the *Benson* formula is clearly favored by the Iowa Supreme Court and was implemented by the parties and the court in the 2002 decree and QDRO, the *Benson* court did not fully define the denominator portion of the service factor fraction. The *Benson* decision does not answer the interpretation issue raised here. . . . .
>     The weight of the evidence, as shown by the two orders and the transcript, shows that the parties and the court did not consider the precise issue whether the service factor fraction could include years of service beyond 35 years at the time the decree and QDRO were entered. . . .

In the absence of language in the decree, QDRO, or stipulation showing an intent to the contrary, the court views the language used in the QDRO as deferring to IPERS.

Richard appeals.

## II.

Our review of an equitable action is de novo. *See* Iowa R. App. P. 6.907. "We review the construction of a dissolution decree as a matter of law." *In re Marriage of Goodman*, 690 N.W.2d 279, 282 (Iowa 2004); *but see In re Marriage of Veit*, 797 N.W.2d 562, 564 (Iowa 2011) (applying de novo review in determining whether QDRO fulfilled terms of dissolution decree); *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009) (reviewing de novo whether district court properly interpreted dissolution decree); *In re Marriage of Pals*, 714 N.W.2d 644, 646 (Iowa 2006) (reviewing de novo the court's ruling in an equitable "proceeding to modify or implement a marriage dissolution decree subsequent to its entry").

## III.

## A.

Before we can examine the merits of Richard's appeal, we must address Julia's jurisdictional argument. She maintains the court lacked jurisdiction to amend the QDRO. Julia claims Richard's petition for a declaratory judgment and/or order nunc pro tunc to amend the QDRO was untimely because he did not appeal the QDRO pursuant to Iowa Rule of Appellate Procedure 6.101(1)(b), nor did he file a petition to vacate or modify judgment pursuant to Iowa Rule of Civil Procedure 1.1013. If Richard were requesting a modification of the property division, we would agree because a property division generally is not modifiable.

*See In re Marriage of Morris*, 810 N.W.2d 880, 886 (Iowa 2012); *see also* Iowa Code § 598.21(7) (2013). But Richard's request is not for modification of the property division. He is asking the QDRO be modified to conform to the property division as set forth in the decree.

Normally, a property disposition that includes the division of retirement benefits proceeds in two steps. First, a dissolution of marriage decree—a substantive order that equitably divides and assigns the parties' property—is entered. *See Brown*, 776 N.W.2d at 647–48 (discussing finality of decrees, property division, and QDROs). Second, for the division of retirement benefits to be implemented, a QDRO is entered directing the plan administrator to make certain specified payments to the ex-spouse.[2] *See id.; see also Breslin v. Synnott,* 54 A.3d 525, 527 (Vt. 2012) (citing 2 B. Turner, *Equitable Division of Property* § 6:20, at 113 (3d ed. 2005)).

> A QDRO is defined in relevant part by [ERISA] as a domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I). In order for the QDRO to be qualified—for the Q to be added to the DRO—certain requirements must be met. See *id.* § 1056(d)(3)(C)-(D). Once the plan administrator qualifies the QDRO, payments are made in accordance with the requirements contained in the QDRO. *Id.* § 1056(d)(3)(A). It is from this statutory scheme and general description of QDRO practice that we draw the conclusion that a QDRO is characterized properly as a procedural device that enforces an underlying substantive order. *See Kremenitzer v. Kremenitzer,* [838 A.2d 1026, 1028 (Conn. Ct. App. 2004)]

---

[2] "Because of certain anti-alienation restrictions in the Employee Retirement Income Security Act (ERISA) and the federal tax code, a QDRO must be filed for every pension division undertaken pursuant to a divorce." *Brown*, 776 N.W.2d at 647–48 (citing *Rohrbeck v. Rohrbeck*, 566 A.2d 767, 768–71 (Md. 1989)). "ERISA does not require a QDRO to be a part of the actual judgment in a case." *In re Marriage of Bruns*, 535 N.W.2d 157, 162 (Iowa Ct. App. 1995) (citing *Baird v. Baird*, 843 S.W.2d 388, 392 (Mo. Ct. App. 1992), and *Rohrbeck*, 566 A.2d at 771).

(explaining that a QDRO is vehicle for enforcing court judgment); see also Turner, § 6:20, at 113–14 (noting "strong general rule" that QDRO is not substantive order, but rather "*procedural device[ ] for enforcing the terms of the underlying substantive order*").

*Breslin*, 54 A.3d at 527–28.

We too draw the conclusion that a QDRO is characterized properly as a procedural device required by federal law and entered to effectuate the property division made in the dissolution decree. We conclude the QDRO is not a "final judgment" subject to the variety of deadlines imposed to challenge a final judgment. *See Veit*, 797 N.W.2d at 564 ("[T]he QDRO is not itself a property settlement, but is merely a method of effectuating the property division contained in a dissolution decree and may be modified later without affecting the finality of the underlying decree."). Additionally, a district court retains authority to interpret and enforce its prior decree. *See Morris*, 810 N.W.2d at 886. We are therefore not persuaded by Julia's argument that the court lacks jurisdiction to amend the QDRO to reflect the property division set forth in the decree accurately.

B.

"A stipulation and settlement in a dissolution proceeding is a contract between the parties." *In re Marriage of Jones,* 653 N.W.2d 589, 593 (Iowa 2002). However, the parties' stipulation is not binding on the court, "as the court has the responsibility to determine whether the provisions upon which the parties have agreed constitute an appropriate and legally approved method of disposing of the contested issues." *Id.* Consequently, once the court enters a decree adopting the stipulation, "[t]he decree, not the stipulation, determines what rights the parties have." *Id.* at 594. "Therefore, in ascertaining the rights of the parties

after final judgment, it is the intent of the district court that is relevant, not the intent of the parties." *Id.*

The district court found, and the parties agree, that the intent of the decretal court was to put the parties' agreement into effect. The parties agreed at the time of the stipulation that they would use the *Benson* formula to divide Richard's defined benefit plan. Thus, the inquiry is whether the decree and the QDRO implement the *Benson* formula or whether the QDRO must be modified to reflect the decretal court's intent. *See id.*

We first discuss the *Benson* formula. In *In re Marriage of Benson,* 545 N.W.2d 252 (Iowa 1996), the court discussed the valuation and division of a defined benefit plan for the purposes of marital property settlement. The court identified two methods of valuing and dividing the property. "One method is to determine the present value of the benefits and allocate a share to the pensioner's spouse (the present-value method)." *Benson*, 545 N.W.2d at 255. The second method "is to award the spouse a percentage of the pension, payable when benefits become matured (the percentage method)." *Id.* "A straight percentage method divides the member's lump sum or gross monthly benefit according to a percentage determined by the parties." *Faber v. Herman*, 731 N.W.2d 1, 8 (Iowa 2007). "A service factor percentage method divides the pension according to a percentage multiplied by a factor based on the member's service during the marriage and the member's total service." *Id.* The present case involves the service factor percentage method of valuation and division. The *Benson* court set forth the formula as follows:

A fraction is first computed, the numerator being the number of years during the marriage [benefits accrued] under the pension plan . . . and the denominator being the total number of years. . . . benefits accrued prior to maturity (i.e., receipt of payments upon retirement). This fraction represents the percentage of [the] pension attributable to the parties' joint marital efforts. This figure is then multiplied by [the spouse's] share of the marital assets (fifty percent). Finally this second figure is multiplied by [the] total accrued monthly benefit upon maturity (retirement) to calculate [the spouse's] share.

*Benson*, 545 N.W.2d at 255.

Having set forth the *Benson* formula we turn to the language of the decree and QDRO to determine whether it divided Richard's IPERS benefit in accord with the *Benson* formula. A dissolution decree is construed like any other written instrument. *In re Marriage of Lawson,* 409 N.W.2d 181, 182 (Iowa 1987).

The decree should be construed in accordance with its evident intention. Indeed the determinative factor is the intention of the court as gathered from all parts of the decree. Effect is to be given to that which is clearly implied as well as to that which is expressed. Of course, in determining this intent, we take the decree by its four corners and try to ascertain from it the intent as disclosed by the various provisions of the decree.

*In re Marriage of Goodman,* 690 N.W.2d 279, 283 (Iowa 2004). In construing a dissolution decree, we give force and effect to every word, if possible, in order to give the decree a consistent, effective and reasonable meaning in its entirety. *Lawson,* 409 N.W.2d at 182–83.

We conclude the plain language of the decree and QDRO expresses the decretal court's intent to use the *Benson* formula and correctly sets forth the *Benson* formula. The QDRO provides:

IPERS is directed to pay benefits to the Alternate Payee as a marital property settlement under the following formula: fifty percent (50%) of the gross monthly or lump sum benefit payable at the date of distribution to the Member multiplied by the "service factor." The

numerator of the service factor is the number of quarters covered during the marriage period of May 24, 1970 through the 23rd day of September, 2002, (the date of the filing of the Decree of Dissolution of Marriage), and the denominator is the Member's total quarters of service covered by IPERS and used in calculating the Member's benefit.

There is little else that needs to be said. The district court reached the same conclusion, stating, "It is clear that the parties agreed to divide Richard's IPERS benefits pursuant to the *Benson* formula—the *Benson* formula was referenced on the transcript and QDRO uses a formula consistent with *Benson.*"

Nonetheless, Richard maintains the QDRO should be amended because the parties meant to use the total number of covered quarters worked as the denominator in the fraction. He cites Julia's testimony from the 2002 hearing as support. Julia testified as follows:

> Q: Rich has a rather substantial IPERS benefit, that is, he has worked for the City of Des Moines for 29 years of service? A: Yes, that's correct.
> Q: Now, it's your understanding that the agreement is that whenever Rich retires or dies or leaves the City of Des Moines or makes a claim for his IPERS benefit, under his eligibility, that you will receive an amount equal to 29 years, that's over a period of time that transpires to that date that the IPERS is paid? A: That's correct.
> Q: And that, say, for example, at age 62 it was 29 years of service over 37.5 years of actual service, on that date that Rich would become eligible at 62? A: That is correct.

Richard contends this "clearly indicates Julia and her attorney understood the denominator used to determine her monthly share of Richard's IPERS benefit would be the total years Richard worked in IPERS-covered employment and would not be limited to 140 quarters or any other number."

Richard's argument regarding the parties' purported intent is largely immaterial to the issue. IPERS uses "a percentage of earnings per year of

service formula, which provides a benefit that is related to the employee's earnings and length of service." *In re Marriage of Sullins*, 715 N.W.2d 242, 249 (Iowa 2006). Richard concedes the decretal court intended to use the *Benson* formula. The *Benson* formula is used to value and divide the portion of the defined benefit accrued during the parties' marriage "in relation to the *total years of benefits accrued* at maturity." *Benson*, 545 N.W.2d at 255 (emphasis added). The court reemphasized the denominator is "*the total number of years . . . benefits accrued* prior to maturity (i.e., receipt of payments upon retirement)." There is a distinction between total number of covered quarters worked and the total number of covered quarters in which additional benefit accrues. *See McDonald v. Pension Plan of NYSA-ILA Pension Fund*, 320 F.3d 151, 156 (2d Cir. 2003) (providing "accrued benefits" are those benefits earned); *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund*, 756 F.2d 977, 981–82 (3d Cir. 1985) (providing an "accrued benefit" represents the interest in a retirement benefit earned each year). Iowa Code section 97B.49A(1)(a) and Iowa Administrative Code rule 495–16.2(3)(m) provide a covered member does not accrue additional benefit beyond 140 quarters of covered service. The legal distinction between the total number of covered quarters worked and the total number of covered quarters in which additional benefits accrue is reflected in the plain language of the QDRO. The QDRO provides the denominator "is the Member's total quarters of service covered by IPERS *and used in calculating the Member's benefit*." Richard's interpretation of the decree and QDRO render the phrase "and used in calculating the Member's benefit" without meaning. His interpretation cannot contradict the plain language of the decree and QDRO.

Richard also seems to contend that the administrative rule limiting the denominator to 140 quarters of covered service should not control over the parties' agreement. As set forth above, the argument fails because the decretal court intended to use the *Benson* formula and because the *Benson* formula uses only covered quarters in which additional benefit accrues. The argument fails for an additional reason. Richard appears to misapprehend the purpose of the *Benson* formula and the purpose of the administrative rule. The purpose of the formula is to determine the percentage of the benefit accrued during the marriage for the purpose of determining the marital share of the benefit to be paid upon maturity. The administrative rule reflects the maximum number of covered service quarters resulting in the accrual of additional benefit; a covered employee accrues no additional service benefit after 140 quarters of covered service. There is thus no reason to include in the denominator quarters of covered service that do not add value to the property at issue. Other courts have reached the same conclusion. *See, e.g.*, *Marriage of Henkle*, 234 Cal. Rptr. 351, 352 (Cal. Ct. App. 1987) (reversing property division where denominator was set at 32 to reflect total years of service and remanding to the district court to use 30 as the denominator where the final two years of the covered employee's service did not count toward service credit); *Halverson v. Halverson*, 589 So.2d 1153, 1155 (La. Ct. App. 1991) (affirming district court order limiting denominator to the number of years resulting in service credit and stating, "We conclude the trial court was correct in finding that 25 years was the maximum amount of creditable service Mr. Halverson could earn under the plan. Although the dollar amount of his

retirement benefits may increase if his salary increases, the total proportion to which he is entitled cannot increase because it is at the maximum now, 60%.").

Richard next contends Julia inequitably received additional benefit because his earnings increased over time due to promotions and raises he received after surpassing 140 quarters of covered service without a corresponding fractional reduction in Julia's marital share for his quarters of service beyond the 140-quarter cap. There is nothing inequitable in the application of the *Benson* formula under these circumstances. First, Richard concedes the parties intended to use the service factor percentage method to divide his pension. There is nothing inequitable in enforcing the bargained-for agreement. Second, the argument was rejected by the *Benson* court. The court explained, because of the way contributions are managed within a defined benefit plan, Richard's benefit increased due to the plan's use of Julia's property left within the plan that might otherwise have been distributed to her at the time of the dissolution:

> During the time from [dissolution] to retirement . . . the entire fund—comprised of the employee spouse's separate property interests and the nonemployee spouse's separate property interests—continues to establish its earnings profile over time. Since these separate property interests are combined until retirement, the plan administrator can invest [both] the employee spouse's [and the nonemployee spouse's] separate property in the fund. This "added" investment value increases the fund's earning power, which in turn is used (and may be necessary) to create the employee's future "defined" benefit . . . . The "defined" benefit received by the employee spouse is made possible ... in part by the use of the nonemployee spouse's separate property interest in the fund. The entire amount of earnings attributable to the nonemployee spouse's separate property interest remains within the fund, committed to create the "defined" benefit. [If] [t]he nonemployee spouse receives only his [or her] value as calculated and "frozen" on the date of [dissolution], [it] allows the employee

> spouse to reap the benefits of the earnings attributable to the nonemployee spouse's separate property interest in the fund. The actual earnings attributable to the nonemployee spouse's separate property interest cannot be awarded to the nonemployee spouse, as a separate value, because they are needed to generate the value of the ultimate "defined" benefit. [I]t seems inequitable for a . . . court to "freeze" the value of the nonemployee's interests in the pension benefits at [dissolution] and prohibit that spouse from realizing any investment income generated from his [or her] separate property interest.

*Benson*, 545 N.W.2d at 257 (quoting Steven R. Brown, *An Interdisciplinary Analysis of the Division of Pension Benefits in Divorce and Post-Judgment Partition Actions: Cures for the Inequities in* Berry v. Berry, 39 Baylor L. Rev. 1131, 1188–89 (1987)).

Numerous courts have considered and rejected the same argument that Richard makes here—that it is inequitable to allow the non-employee spouse to collect a percentage of the defined benefit due to increased earnings—for the same or similar rationale set forth in *Benson*. *See Hartley v. Hartley*, 205 P.3d 342, 349–50 (Alaska 2009) (recognizing the "marital foundation" approach and concluding it is equitable to allow the former spouse to share in the increased benefit); *Halverson*, 589 So.2d at 1155; *In re White*, 809 A.2d 1286, 1290 (N.H. 2002) (stating the court's goal in applying the service percentage "formula is equitable, though not necessarily equal, property distribution" and rejecting argument the non-employee spouse is inequitably receiving the benefit of post-marital salary increases); *Thompson v. Thompson*, 965 N.E.2d 377, 386 (Ohio Ct. App. 2011) (rejecting equitable argument and concluding the service percentage method "does not deprive the member spouse of her separate

property or otherwise unfairly disadvantage the member spouse"); *see also In re Marriage of Hunt*, 909 P.2d 525, 533–34 (Colo. 1995) (collecting cases).

IV.

The plain language of the decree and qualified domestic relations order expresses the decretal court's intent to use the service percentage method for dividing Richard's IPERS benefit.  The decree and QDRO correctly sets forth the service percentage formula as expresses in *Benson.*  The application of the *Benson* formula is equitable under the circumstances.  For these reasons, we affirm the judgment of the district court.

**AFFIRMED.**

Mullins, J., concurs; Danilson, C.J., dissents.

**DANILSON, Chief Judge.** (dissenting)

I respectfully dissent. I view the majority opinion as effectuating a modification of the *Benson* formula[3] for dividing the pension benefits of long-term IPERS employees. Here, Julia stands to gain and Richard to lose about $600 per month in pension benefits.

Richard's Iowa Public Employees Retirement System (IPERS) account was a marital asset and, for purposes of an equitable distribution, was divided between the parties. Here, the decree and Qualified Domestic Relations Order (QDRO) must be interpreted to determine the proper division of the account. IPERS administrative rules must yield to the property rights of each party. And if not, then an order could be entered to require Julia to pay, on a monthly basis, to Richard the overpayment of benefits so that each party may receive the amount awarded to them by the decree.

The purpose of the hearing held in district court on May 29, 2002, was to present testimony of the parties' settlement "on the record for the basis for entry of this decree," according to the decree. Several subsequent hearings were held before the decree was entered on September 23, 2002.

The parties' dispute on appeal now centers upon the proper interpretation of the decree and the QDRO entered in connection with Richard's IPERS account. The decree provides only that "the petitioner shall receive a percentage of the respondent's IPERS asset as set forth in the [QDRO] which shall be entered subsequent to the entry of the decree." Because the decree, in essence, incorporates the language in the QDRO, it must be concluded the QDRO was not

---

[3] *See In re Marriage of Benson,* 545 N.W.2d 252, 255-56 (Iowa 1996).

supplemental or collateral to the decree, but rather a part of the underlying decree. *Cf. In Re Marriage of Brown*, 776 N.W.2d 644, 648-49 (Iowa 2009) (concluding a QDRO is supplemental if it intends to enforce the earlier decree dividing the parties' property). We are faced with interpreting a decree that includes the incorporated language of the QDRO, not a modification of an earlier-entered decree.

The district court clearly determined the parties intended—and the decretal court shared the same intent[4]—to divide Richard's IPERS benefits pursuant to the *Benson* formula in concluding:

> In considering the intention of the court from 2002, the court in 2014 uses the decree, the QDRO, and the transcript from the hearing on May 29, 2002, to determine the intent of the court's order. There is no indication that the court had any intent other than to put into place the agreement of the parties. The parties entered a stipulation of their agreement on the record on the date of trial. They followed up by presenting a proposed decree and proposed QDRO. The portion of the decree that addresses Richard's IPERS benefits expressly incorporated the terms of the QDRO, which set out the division of IPERS in more detail. The QDRO was also referenced in the stipulation. It is clear that the parties agreed to divide Richard's IPERS benefits pursuant to the *Benson* formula—the *Benson* formula was referenced on the transcript and the QDRO uses a formula consistent with *Benson*. Accordingly, if *Benson* answers the question at issue here, then *Benson* should so apply.

I agree.

The district court then concluded the *Benson* court did not fully define the denominator portion of the service factor fraction. Ultimately, the district court determined the parties and the decretal court did not "consider the precise issue whether the service factor fraction could include years of service beyond 35

---

[4] The intent of the parties is irrelevant unless it is shared by the court. *See In re Marriage of Morrris*, 810 N.W.2d 880, 886 n.2 (Iowa 2012).

years at the time the decree and QDRO were entered," and without language to the contrary, the language in the QDRO defers to IPERS.

I disagree with the district court that the *Benson* court did not fully define the denominator. I acknowledge the majority in *Benson* described the denominator as "the total number of years" the "benefits accrued prior to maturity (i.e., receipt of payments upon retirement)," *see* 545 N.W.2d at 255, and this description could lend itself to some confusion where contributions are no longer required, but the employee has not yet retired and begun receiving benefits. Moreover, the confusion is compounded by other case law using different terminology to describe the denominator. *See In re Marriage of Sullins*, 715 N.W.2d 242, 250 (Iowa 2006) ("[T]he denominator is the total number of years of benefit accrual."); *In re Marriage of Mott*, 444 N.W.2d 507, 511 (Iowa 1989) (stating the denominator is the total number of years employee "worked and accumulated pension benefits").

However it is quite clear, the dissent in *Benson* was concerned about the denominator being the date of retirement by its various references to retirement. *See* 545 N.W.2d at 258-61 (Lavorato, J., dissenting) (Larson and Ternus, JJ., joining). The dissent noted, "[S]etting the value of the pension benefit at the time the employee spouse *retires* does violence to the principle that marriage partners are entitled to a just and equitable share of the property accumulated through their *joint* efforts." *Id.* at 261 (first emphasis added). And again noted, "Setting the value of the pension benefit at the time the employee spouse *retires* can also prove to be unfair." *Id.* (emphasis added).

The dissent in *Benson* argued that allowing the non-covered spouse to benefit from post-dissolution increases in pension benefits was contrary to the principle that only the property accumulated through their joint efforts should be divided. *Id.* If the denominator was determined at the time contributions ceased and the covered employee could have retired, the dissent would have had an even stronger argument. Yet, this is the position taken by the majority in this case. Clearly, the *Benson* formula incorporates a denominator fixed generally by the date of retirement but specifically when he or she "actually receives or begins to draw benefits." *Id.* at 256.

Two factors determine the amount of benefits—the number of quarters worked and the highest five years of income. *See* Iowa Code §§ 97B.1A (defining "final average covered wage"); .49A (calculation of monthly allowance); *Sullins*, 715 N.W.2d at 250. If the denominator's increase stops when Richard could have retired, then Julia's share should be calculated as if Richard had retired and begun receiving benefits. Instead, under the majority's approach, Julia stands to benefit from any raises Richard received in his last five years or so of employment, but Richard is forced to use a denominator fixed when he was eligible to retire and before he ever was receiving benefits.

The district court and the majority attempt to support their conclusion of such an inequitable resolution by interpreting the QDRO and applying IPERS' administrative rules. I submit the QDRO, and therefore the decree, are ambiguous, and should be interpreted consistent with the decretal court's intent and in the only fair and reasonable manner as described above. Our rules of interpretation and construction have been aptly stated in *In re Marriage of*

*Lawson*, 409 N.W.2d 181,182 (Iowa 1987), and *Berryhill v. Berrryhill*, 428 N.W.2d 647, 653-55 (Iowa 1988), and need not be restated here.

Before discussing the interpretation of the decree, I must address Julia's argument that this action must be dismissed because IPERS is not a party. Here, the parties clearly dispute the proper interpretation of the language contained in the QDRO and incorporated into the decree. The dispute relates to the proper percentage of Richard's IPERS benefits each party was entitled to receive under the property settlement. On this issue, IPERS has no standing. Further, "the existence of another remedy does not preclude a judgment for declaratory relief." Iowa R. Civ. P. 1.1101. There is a substantial controversy between the parties who have adverse interests. *See Greenbriar Group, L.L.C. v. Elkco Props., Inc.*, 854 N.W.2d 46, 51 (Iowa Ct. App. 2014). If the judgment is not accepted by IPERS then subsequent legal proceedings may be initiated against IPERS, or a separate order could be sought and entered to effectuate the judgment. Such an order could require Julia to pay Richard on a monthly basis the difference between what she is receiving from IPERS and what our judgment provides she is entitled to receive.

Here, the language in the QDRO and as incorporated into the decree includes two divergent sentences when defining the fraction to apply in dividing Richard's benefits. The first sentence provides, "IPERS is directed to pay benefits to the Alternate payee as a marital property settlement *under the following formula*: fifty percent (50%) of the gross monthly or lump sum benefit at the date of distribution to the Member multiplied by the '*service factor.*'" (emphasis added). Under our supreme court's definition, "A service factor

percentage method divides the pension according to a percentage multiplied by a factor based on the member's service during the marriage and the member's total service." *Faber v. Herman*, 731 N.W.2d 1, 8 (Iowa 2007). The phrase, "member's total service" clearly means what it says, and includes the time until Richard retired and began receiving benefits consistent with the *Benson* formula.

I concede the second sentence is more troublesome and causes the ambiguity in these proceedings. The second sentence describes the numerator and then states, "and the denominator is the Member's total quarters of service covered by IPERS and used in calculating the Member's benefits." However, the QDRO makes no reference to a maximum number of quarters that may be used in calculating the member's benefits. There is also no reference to statutory or regulatory authority to supplant the language other than language later in the order that says the parties intend the order to be a QDRO under federal law, and "Iowa Code section 97B.39 and the administrative rules."

Subsequent to the entry of this order, specifically in February 2015, an administrative-rule change explicitly provided that the denominator of a fractional share per a QDRO could not exceed 140 quarters. Iowa Admin. Code r. 495-16.2(3)(m). At one juncture, but also subsequent to the entry of the order, the number was 120 quarters. Property divisions are generally not modifiable. *Morris*, 810 N.W.2d at 886. Yet by administrative rule, IPERS facilitates a modification of the parties' property distribution and rights, each and every time the denominator is revised.[5]

---

[5] IPERS is obligated to comply "with the provisions of a marital property order requiring the selection of a particular benefit option, designated beneficiary, or contingent

Because IPERS is not a party to this action and this is a declaratory judgment action, all that can be done is to declare the parties' rights. I would reverse and remand with directions that the parties' shares of Richard's IPERS benefits be determined by the *Benson* formula, and the denominator of Julia's fractional share be determined by Richard's total years of service (i.e., ending when he retired and began to receive benefits).[6] Further litigation may be necessary to implement or facilitate such a declaration of rights. This interpretation of the terms of the QDRO as incorporated in the decree is consistent with the decretal court's intent and the parties' intent at the time the decree was entered. It is also consistent with the *Benson* formula and with the laws and rules in effect at the time the decree was entered. Any modification of the *Benson* formula should be deferred to the supreme court. And, finally, it is fair and just with respect to both parties.

---

annuitant if the selection is otherwise authorized by this chapter and the member has not received payment of the member's first retirement allowance." Iowa Code § 97B.39. The administrative rule requires the denominator of the *Benson* formula to be fixed at 140 quarters notwithstanding the fact that the "alternate payee," the former spouse, was not a covered "employee" as defined in Iowa Code section 97B(8). Iowa Admin. Code r. 495-16.2(3)(m). Ironically, according to the testimony of the IPERS representative at the hearing in these proceedings, the representative acknowledged that IPERS accepts a percentage established in a decree as a proper method to divide benefits. However, if the division is expressed as a fraction, IPERS determines the denominator if it exceeds 140 quarters. The difference in the shares is significant depending on the denominator used, as noted in Richard's exhibit H. Upon a pure *Benson* formula calculation, Julia's share is $3913.46 a month, but if the formula is modified as IPERS calculates, Julia's share is $4612.29 a month.

[6] The record made in these proceedings is somewhat murky as Julia filed a motion for summary judgment, which was granted by the district court's order filed December 4, 2014. However, the same order also provided that the petition for declaratory order and application for order nunc pro tunc were denied. Subsequently, an amended order was entered acknowledging that Julia's motion for summary judgment had been orally denied prior to the trial on the merits of the petition.