# IN THE SUPREME COURT OF IOWA

No. 143 / 05-1040

Filed April 6, 2007

**STEVEN J. FABER**,

Appellee,

vs.

**DOUGLAS D. HERMAN**,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Jones County, L. Vern Robinson, Judge.

Further review from a decision by the court of appeals affirming a judgment for damages in a legal malpractice action. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

Patrick M. Roby and Robert M. Hogg of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellant.

Max E. Kirk of Ball, Kirk & Holm, P.C., Waterloo, for appellee.

**CADY, Justice.**

In this appeal from a judgment against a lawyer in a legal malpractice action based on claims of negligence while representing a former client in a dissolution proceeding, we conclude the claims of malpractice did not cause the damages sought as a matter of law. We vacate the decision of the court of appeals and reverse the judgment of the district court.

## I.  Background Facts and Proceedings.

Douglas Herman is an Iowa lawyer. He represented Steven Faber in an action to dissolve his marriage to Karen Faber. Karen was represented by attorney Karl Moorman.

The Fabers were married for nineteen years at the time the dissolution action was commenced. The divorce presented many challenging issues, not the least of which was the equitable division of their marital property. The parties and their attorneys worked to resolve these issues, which ultimately resulted in a stipulated decree for dissolution of marriage.

One item of property divided under the stipulation and decree was Steven's retirement account with the Iowa Public Employer's Retirement System (IPERS). Steven began working for the State of Iowa two years after the marriage. He worked at the Anamosa state penitentiary as a corrections officer, and continued to be employed in that capacity until after the divorce.

Based on information provided by IPERS during the pendency of the divorce, Steven learned the "investment value" of his retirement account was $38,179.38, and the "death benefit" was $63,785.94. The "death benefit" represented the amount to be distributed to Karen, as the designated beneficiary, in the event of Steven's death. The "investment

value" represented the amount Steven would receive in a lump sum payment if he retired from his employment with the State of Iowa on the day the value was determined. Steven was vested in the pension plan, and therefore the "investment value" represented all of his personal contributions during the course of his employment plus a portion from his employer.

Steven and Karen agreed to divide the IPERS account equally. To accomplish this division, they considered the "investment value" to be the value of the account, and they sought to divide the account by means of a qualified domestic relations order (QDRO) that required IPERS to immediately pay Karen one-half of the investment value, or $19,100. Specifically, the stipulation required Steven to "immediately pay $19,100.00 to [Karen] from his I.P.E.R.S. retirement account pursuant to a separate Qualified Domestic Relations Order issued by the Court."

Steven and Karen also prepared an itemization of the division of all their property by listing each item of property received by each party in separate columns, with a corresponding value assigned to each item. This itemization was attached to the written stipulation signed by the parties. Steven's column included "IPERS (one-half)" with a value of "$19100." Likewise, Karen's column included "IPERS (one-half)" with a value of "$19100." The stipulation was signed by Steven and Karen in May 1999, and the decree was entered by the court.

Moorman then drafted a proposed QDRO to divide the IPERS account pursuant to the stipulation. This proposed order essentially directed IPERS to create a separate interest for Karen in the amount of $19,100, payable to her as a participant under the plan. Moorman then sent the order to the administrator of IPERS for approval. IPERS rejected the proposed QDRO because it allowed Karen to acquire independent

rights in the account. IPERS informed Moorman that Karen could not receive any benefits until Steven began to receive benefits or died. IPERS also informed Moorman that Karen had no right to independently select a distribution option and begin receiving benefits, or to have a separate account set aside in her name.

Moorman then drafted a new QDRO that abandoned the lump-sum division approach agreed to by the parties under their stipulation. The new QDRO provided for the benefits to be distributed to Steven and Karen upon Steven's retirement under a formula based on the length of the marriage and the length of employment. The QDRO provided:

> IPERS is directed to pay benefits to [Karen] as a marital property settlement under the following formula: Fifty percent (50%) of the gross monthly or lump sum benefit payable at the date of distribution to [Steven] multiplied by the "service factor." The numerator of the service factor is 70 and the denominator is [Steven's] total quarters of service covered by IPERS.

Under the QDRO the benefits were to inure to Karen as an alternate payee for Steven's life, and were not to begin until "[Steven] begins to receive benefits from IPERS or when the death benefits become payable . . . whichever occurs first." IPERS approved this QDRO, and it was signed by Herman, Moorman, and the court in July of 1999.

Herman did not directly participate in drafting the QDRO, but he did approve it. Herman acknowledged his approval in a letter to Steven in September of 1999. The letter informed Steven the QDRO had been finalized, and it divided his IPERS account "consistent with the stipulation." Herman did not tell Steven that IPERS rejected the lump-sum payment approach agreed to under the stipulation, and he did not explain the percentage method of distribution ultimately used to divide the pension. Consequently, Steven understood at the conclusion of his

divorce that his IPERS account had been divided pursuant to the stipulation.

In 2000, the Iowa legislature amended the law governing IPERS to permit in-service disability benefits. 2000 Iowa Acts ch. 1077, § 51 (codified at Iowa Code § 97B.50A (2001)). Steven subsequently applied to IPERS for disability retirement as a result of exposure to mace and second-hand smoke while working at the prison. IPERS approved his application in January 2001, and eventually informed him that due to the QDRO on file he would receive monthly benefits of $1,209.77, and Karen, as the alternate payee, would receive $962.31 each month.

Steven was surprised to learn Karen would receive a portion of the monthly benefits, and he wrote a letter to Herman expressing his displeasure with the distributions from IPERS. As a result, Herman tried several times to modify the QDRO to provide Steven with a more favorable result. Ultimately, Herman's efforts were unsuccessful and the distributions under the QDRO remained the same.

Steven then brought a legal malpractice action against Herman. He claimed Herman was negligent in preparing and drafting the stipulation and QDRO, and in advising him in the division of the pension. He sought damages based on the amount of benefits Karen would receive in excess of the amount she was entitled to recover under the stipulation.

The case proceeded to trial. The jury found Herman seventy percent negligent and Faber thirty percent negligent. It also found past damages of $20,984.47, and future damages of $88,349.93.

Both parties subsequently filed motions for judgment notwithstanding the verdict. Steven argued the record did not support the jury's finding that he was thirty percent negligent. Herman argued

the verdict against him was contrary to law and not supported by the evidence. In addition, Herman alleged the measure of damages submitted to the jury was improper, certain evidence should not have been deemed inadmissible hearsay, and the court erred in submitting several jury instructions. The district court denied both parties' motions, and both parties appealed.

Herman raised four claims of error on appeal. First, he alleged the district court erred in failing to direct a verdict because there was insufficient evidence that any negligence on his part actually or proximately caused Steven any damage. Second, Herman claimed there was insufficient evidence to support the four specifications of negligence submitted to the jury. Third, Herman claimed the damage instruction submitted to the jury was based on an improper measure of damages. Finally, Herman claimed the damages awarded were speculative, excessive, and not reasonably foreseeable. On cross-appeal, Steven claimed the district court erred in instructing the jury to consider his fault.

We transferred the case to the court of appeals. The court of appeals rejected each claim raised by Herman, and reversed the jury's assessment of fault against Steven. We granted further review sought by Herman.

## II. Issues.

"On further review, we can review any or all of the issues raised on appeal or limit our review to just those issues brought to our attention by the application for further review." *Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005). In his original appeal, Herman argued the district court should have granted his motions for directed verdict and judgment notwithstanding the verdict because Steven failed to prove

causation. Specifically, Herman alleged there was insufficient evidence to show Karen would have agreed to any result other than what the QDRO provided. On further review, Herman argues Steven cannot show causation because of our holding in *In re Marriage of Sullins,* 715 N.W.2d 242 (Iowa 2006). Specifically, Herman claims Karen would not have been able to receive a lump sum payment of $19,100 under our holding in *Sullins* because this figure was not derived from actuarial methods. Causation is the issue we choose to address on further review.

### III. Standard of Review.

We are required to determine the propriety of our court of appeals' decision regarding Herman's motion for judgment notwithstanding the verdict. Rulings on motions for judgment notwithstanding the verdict are reviewed for the correction of errors at law. Iowa R. App. P. 6.4; *Estate of Long ex rel. Smith v. Broadlawns Med. Ctr.,* 656 N.W.2d 71, 79 (Iowa 2002) ("We review the district court's decisions on the motion [for judgment notwithstanding the verdict] for errors at law.").

### IV. Causation.

Herman argues the grounds of negligence alleged by Steven could not have caused the damages sought because Steven and Karen intended to divide the pension equally at the time of the divorce, which is exactly what the parties ultimately received. Thus, Herman claims any claim of negligence supported by the evidence was not a cause of the damages sought by Steven.

Causation is an essential element in a cause of action based on negligence. *See Crookham v. Riley,* 584 N.W.2d 258, 265 (Iowa 1998) (noting causation must be proved in a legal malpractice action "the same as any other negligence action"). It is composed of two components. The

first is a "but-for" or "cause in fact" component. *Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 774 (Iowa 2006). The second is a "legal cause" or "proximate cause" component. *Id.* A defendant's conduct is not a cause in fact " '[i]f the plaintiff would have suffered the same harm had the defendant not acted negligently.' " *Berte v. Bode,* 692 N.W.2d 368, 372 (Iowa 2005) (citation omitted). The defendant's conduct is not a legal cause " 'if the harm that resulted from the defendant's negligence is so clearly outside the risks he assumed that it would be unjust or at least impractical to impose liability.' " *Id.* (citation omitted). The question of causation is normally for the jury to decide, but there are circumstances when the issue can be decided as a matter of law. *See Ruden v. Jenk,* 543 N.W.2d 605, 611–12 (Iowa 1996) (holding, as a matter of law, defendant failed to show proximate cause).

Causation in a negligence action must be analyzed in the context of the relationship between those theories of negligence supported by the evidence and the theory of damages sought by the plaintiff. Actual causation, as well as legal causation, must exist between the breach of the duty of care and the damages sought. The theory of damages alleged by Steven was based on the amount of benefits Karen would ultimately receive under the QDRO in excess of the $19,100 Karen was to receive under the stipulation. Steven claims this amount represents his compensatory damages because the excess benefits received by Karen should have been received by him.

The jury was instructed on four claims of negligence. They included:

> 1. Drafting a stipulation (to provide for an immediate payment to Karen of $19,100) contrary to the terms of the IPERS plan.

2.     Failing to prepare a QDRO to provide Karen with a specific dollar amount.

3.     Failing to advise Steven that he could have divided the pension with non-pension assets worth $19,100.

4.     Failing to advise Steven that the QDRO approved by IPERS and entered by the court divided the pension by a different method than agreed under the stipulation.

In analyzing each claim of negligence, we begin with the fundamental principle that pensions can be divided in one of two basic ways. *See In re Branstetter*, 508 N.W.2d 638, 642 (Iowa 1993) ("There are generally two ways for a court to divide pension benefits."). Parties can agree the non-member will receive a share based on the present worth of the pension, or receive a share of the pension benefits at some point in the future when they become payable to the pensioner. *Id.* Thus, the difference between the two methods involves the payment of an immediate amount or the payment of an amount in the future. We have previously identified this difference by using the terms "present value method" and "percentage method." *Sullins*, 715 N.W.2d at 248.

The division of a defined-benefit pension plan, such as IPERS, under the present value method requires the use of actuarial science. *Id.* (citing *In re Benson*, 545 N.W.2d 252, 255 (Iowa 1996)). For this reason, we have said "it is normally desirable to divide a defined-benefit plan by using the percentage method." *Id.*; *see Benson*, 545 N.W.2d at 255 (recognizing the disadvantages of an "immediate distribution"). Additionally, it is usually too difficult "for a pensioner to pay a lump sum amount representing the present value of a defined pension plan." *Sullins*, 715 N.W.2d at 248–49. It is difficult because the lump sum amount is normally paid through an award of non-pension benefits. *Id.* In this case, Steven's IPERS account was ultimately divided using the "normally desirable" percentage method. *Id.* at 248.

The future division of IPERS benefits does not usually require actuarial science, but it does require a QDRO. A QDRO is necessary because a future division divides the member's *benefits.* Without a QDRO, the member's benefits would be distributed to the member according to the terms of the pension plan. The QDRO directs the distribution of future benefits to the former spouse as an alternate payee.

Generally, a QDRO can divide an IPERS account between a member and a nonmember spouse in a divorce in three basic ways: A "straight percentage method," a "service factor percentage method," and a "dollar amount method." *See Instructions for Using Iowa Public Employees' Retirement System (IPERS) Model QDRO, available at* http://www.ipers.org/docs/qdro/ipersqdromodel.doc (last visited March 27, 2007) [hereinafter *Model QDRO*]; *see also* Iowa Code § 97B.39 (requiring, *inter alia,* that "[t]he system shall comply with the provisions of a marital property order requiring the selection of a particular benefit option, designated beneficiary, or contingent annuitant if the selection is otherwise authorized by this chapter"); Iowa Admin. Code r. 495–16.2 (2004) (allowing fixed dollar amount or percentage methods under a QDRO). A straight percentage method divides the member's lump sum or gross monthly benefit according to a percentage determined by the parties. *See Model QDRO.* A service factor percentage method divides the pension according to a percentage multiplied by a factor based on the member's service during the marriage and the member's total service. *See id.* Finally, a dollar amount method divides the member's lump sum or gross monthly benefits based on a specific dollar amount awarded to the alternate payee.[1] *See id.* Thus, an IPERS account can be divided in

---

[1]Notably, this last method of future division incorporates concepts unique to what we have termed a "present value division" and a "percentage division." *See Sullins,* 715 N.W.2d at 248. The dollar amount method of division under a QDRO is

a divorce by one of these three basic methods, or by means of non-pension assets based on the present value of the pension at the time of the divorce.

Our analysis in this case turns on the realization that a one-half division under each method of division produces the same basic result. In other words, if the parties agree to divide a pension equally, an equal division will occur regardless of the method of division selected so long as the methods are properly applied. Of course, an equal division under some of the methods would involve an extremely complex analysis and would be difficult to achieve. *See Benson*, 545 N.W.2d at 255. This difficulty underscores our previous observation that the service factor percentage approach is the preferred method, even though no method of division can be precise in carrying out the parties' agreement. It is in this light that we consider whether the claims of negligence caused the damages Steven alleges.

The first claim of negligence is that Herman drafted a stipulation (providing for an immediate payment of $19,100 from the IPERS account by means of a QDRO) that could not be carried out pursuant to a QDRO because it was contrary to the IPERS regulations. While Herman was clearly negligent in drafting a stipulation to provide for a division of the pension by a means not permitted by law, it is equally clear that this

_____

similar to the present value method because both methods attempt to state the alternate payee's share in current dollars. This, of course, requires the use of actuarial science. *Id.* The difference between the two methods is that under a present division, the alternate payee receives a definite amount of non-IPERS marital assets immediately, and under a QDRO's dollar amount division, the alternate payee receives a definite amount of IPERS benefits sometime in the future. Thus, an equitable division under a QDRO's dollar amount method is even more complicated than a present division of the pension with non-IPERS assets because it requires an actuary to consider the date of distribution as an additional variable. For these reasons, we again emphasize "it is normally desirable to divide a defined-benefit plan by using the percentage method." *Id.* at 248–49.

negligence was not a factual cause of the damages claimed by Steven. The damages claimed by Steven are based on the amount of payments Karen has received and will continue to receive under the service factor percentage method of division in excess of $19,100. Yet, Steven would have suffered this same damage if Herman had drafted a stipulation based on an approved method of division.

The important point is the stipulation clearly expressed the intention of the parties to divide the pension equally. A defined-benefit pension plan such as IPERS can only be divided in one of several methods. If the parties agree to split the pension equally, any method of division will produce the same basic result if properly done. Importantly, there is no claim of negligence raised by Steven that the method ultimately used in this case was misapplied. Thus, the damages claimed by Steven would have occurred in any "one-half" division under our approved methods of division. Steven would have suffered the same harm he now claims if Herman had drafted the stipulation to equally divide the pension under any approved method of division. The causation element was not satisfied as a matter of law.

The next ground of negligence concerns Herman's failure to draft a QDRO that would limit Karen's share to a specific dollar amount. More specifically, Steven claims Herman could have drafted a QDRO to limit the amount of future benefits available to Karen under the IPERS plan. Yet, Steven would again suffer the same damage he now claims (the amount of benefits Karen has received and will receive in excess of $19,100) if Herman had drafted a QDRO with a specific dollar limitation. While a QDRO can limit the benefits to an alternate payee, any limitation on the future benefits available to Karen in this case would need to represent one-half of the value of the pension. This amount would be the

practical equivalent of the amount Karen is receiving now. Steven overlooks that the pension was to be split in "one-half" shares, and that under any allowable method of division, "one-half" would equal more than the $19,100 he claims. *See Sullins*, 715 N.W.2d at 249 ("[T]he present value of her IPERS plan is more than the present value of her contributions."). Although the parties believed the value of the pension was $38,200, that figure only represented the value of the pension as a liquid asset. The pension could only be divided into equal shares of $19,100 as a liquid asset. However, as a benefit payable in the future, its present value was not equivalent to its investment value. *See Benson*, 545 N.W.2d at 256 (recognizing the difference between investment value (amount a pensioner would be entitled to receive if retired immediately and began drawing) and amount pensioner will receive when benefits are drawn after retirement). Thus, if Herman had properly prepared a QDRO to cap Karen's future benefits as Steven claimed he should have done, then Herman would have been required to determine a cap based upon an equal division of the pension as a future benefit. Such a limitation would far exceed $19,100. *See Sullins*, 715 N.W.2d at 250 (noting "the district court's valuation and distribution . . . fell far short of our accepted methods"). Consequently, this claim of negligence does not satisfy the causation element because Steven would have suffered the same harm he now claims if Herman had drafted a QDRO to limit Karen's future distribution. Such a method of division would have achieved a "one-half" division amounting to more than $19,100, and which would be, for all intents and purposes, the same as the division the parties have received.

The next ground of negligence concerns the claim that Herman failed to tell Steven that he could have divided the pension with non-

pension benefits instead of dividing the pension under a QDRO. Armed with this advice, Steven claims he could have preserved the pension for himself by giving Karen $19,100 in non-pension assets.

This ground of negligence also fails to support causation because Steven would have suffered the same harm he now claims if the pension had been divided using non-pension assets. Steven's claim of negligence overlooks that if Herman would have drafted a stipulation to divide the pension with non-pension assets, the value of the pension under this method of division would far exceed $38,200. *See id.*; *Benson*, 545 N.W.2d at 256. When a pension is divided by means of non-pension assets, the non-pensioner spouse gives up a future interest in the pension and must consequently receive non-pension assets equal to the present value of that future interest.

The final ground of negligence was that Herman failed to inform Steven of the change in the method of dividing the pension from an immediate lump sum payment to the percentage method of division. As with the other grounds of negligence, however, Steven would have suffered the same harm he now claims if Herman had told him of the change in the method of division. This result occurs because any method of division ultimately used to divide a pension equally will, when properly used, achieve an equal division. Of course, an equal division was the outcome sought by Steven and the outcome he ultimately obtained.

The common theme with all four claims of negligence is that the parties desired an equal division of the pension, and the only time such a result will not be achieved is when the method employed is erroneously utilized. This was not the case here. Karen received a "one-half" share in the "normally desirable" way, and Steven has essentially suffered the

same harm he would have suffered had Herman not been negligent. *Sullins,* 715 N.W.2d at 248. In other words, whatever method Steven would have preferred to use to divide his IPERS pension, a "one-half" division under any method would have yielded the same result. While the division could have been accomplished by different methods, each with its own advantages and disadvantages, a division by "one-half" under any method is the practical equivalent for the purposes of determining causation under Steven's theory of compensatory damages. Thus, in the end the negligence of Herman in failing to advise Steven about the methods to equally divide a pension and to draft a stipulation and QDRO to fully protect his one-half interest was not a cause of the damage claimed because the method of division ultimately used by Herman gave Steven his equal division of the pension. This division was not what Steven expected, but his expectation or misunderstanding of the method of distribution was not a cause of the damages claimed. The negligence of Herman in failing to advise Steven of the change may have caused some damages, such as incidental and consequential damages, but not the compensatory damages (difference between the amount of benefits under the stipulation and the amount of benefits under the QDRO that was entered) sought by Steven.

The district court erred by failing to grant Herman's motion for judgment notwithstanding the verdict. As a matter of law, there was no causation between the theories of negligence alleged by Steven and his theory of damage. Consequently, it is unnecessary to address the additional issues raised in the appeal and cross-appeal. We vacate the decision of the court of appeals and reverse the judgment entered by the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

All justices concur except Hecht, J., who takes no part.