# IN THE COURT OF APPEALS OF IOWA

No. 16-0597
Filed January 25, 2017

IN RE THE MARRIAGE OF BRIAN K. SMITH
AND BONNIE J. SMITH

Upon the Petition of
BRIAN K. SMITH,
    Petitioner-Appellant/Cross-Appellee,

And Concerning
BONNIE J. SMITH n/k/a BONNIE J. HOUGH,
    Respondent-Appellee/Cross-Appellant.

_____

    Appeal from the Iowa District Court for Linn County, Fae E. Hoover

Grinde, Judge.


    Both parties appeal the economic provisions of the decree dissolving their

marriage. **AFFIRMED AS MODIFIED AND REMANDED.**


    Kyle A. Sounheim of Lynch Dallas, P.C., Cedar Rapids, for appellant.

    Jacob R. Koller of Simmons Perrine Moyer Bergman P.L.C., Cedar

Rapids, for appellee.


    Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Brian Smith appeals and Bonnie Hough[1] cross-appeals the economic provisions of the decree dissolving their marriage. We affirm the district court's order that Brian compensate Bonnie for an equal share of the increase in the value of the marital home. But we modify the decree in several ways, including changes to the division of Brian's retirement assets and a recalculation of the equalization payment. We remand for the district court to modify the decree in accordance with this decision.

## I.     Facts and Prior Proceedings

Brian and Bonnie met in the summer of 1998. At that time, Bonnie and her two sons were living in Tennessee. They moved to Iowa the next summer to live with Brian. Bonnie and Brian were married on September 28, 2002; they had no children together. Bonnie's children graduated from high school and left the marital home by 2008.

Brian is fifty-eight years old. He has a community-college degree and works as a senior mechanical engineer at Rockwell Collins. He has been a full-time employee there for thirty-six years, earning more than $105,000 per year.

Bonnie is fifty-one years old. In 1986, she graduated with a bachelor's degree in secondary education—physical education and health. In 2002, Bonnie started online classes toward her masters of health administration degree, but she had not completed the program by the time of trial. When Bonnie left Tennessee in 1999, she was earning $65,000 per year; she found a job in Iowa paying $20,000 less per year. It took her about ten years in Iowa to obtain a

---

[1] The district court granted Bonnie's request to return to using her maiden name.

salary level somewhat equivalent to her Tennessee income, despite the fact she consistently maintained full-time employment. She now earns $90,200 per year as a senior administrator overseeing seventy staff members in two Unity Point Clinics.

In January 1989, Brian paid $55,498 to purchase the home that became the marital residence. Thus, Brian owned the home for a decade before Bonnie moved to Iowa. The home was assessed at $119,585 when the parties married, and in June 2003 the mortgage principal was $39,539. In 2004, Brian and a friend completed a major addition on the home, with Brian utilizing his exceptional woodworking skills. Brian testified the addition was intended to accommodate the whole family—the boys had separate bedrooms, he and Bonnie had a larger master bedroom, and a bigger living room allowed them "to spread out." Brian also updated existing areas, and the parties purchased new appliances. Bonnie had input on the project's design and planning. She also cleaned up construction debris and landscaped the property. At the time of trial, the home's assessed value had increased from its 2003 value by $54,915—to $174,500, and the joint mortgage's principal balance had been reduced to $31,057, i.e., an $8482 pay down of mortgage debt during the marriage.

During the parties' marriage, they agreed to keep separate accounts for their banking and credit cards. Bonnie covered her children's health insurance for two years during the marriage; thereafter, Brian covered them under his Rockwell Collins health insurance.[2] The parties agreed Bonnie would pay all the

---

[2] Bonnie explained her ex-husband's employment was sporadic; thus, he was unable to provide consistent health insurance for their sons.

children's expenses—school, clothing, and medical. Sometimes she worked part-time jobs, in addition to her full-time job, to meet her expenses.[3] Brian bought birthday and Christmas presents for the children; "gave them money every so often"; and when their high school graduations approached, Brian voluntarily started a 529 college savings plan for them.[4] *See* 26 U.S.C. § 529 (allowing states to establish qualified tuition programs where person may contribute for designated beneficiaries). At trial, Bonnie admitted Brian had no legal obligation to support her sons.

The parties also agreed to a specific plan to divide their living expenses. As of 2003, any loans secured by the real estate were joint loans. But Brian would pay for the mortgage, tax, and insurance on the house, while Bonnie paid for the utilities (electric, water, sewer), the home telephone—until it was discontinued—everyone's cell phones, cable television, and groceries. Bonnie paid for landscaping materials and provided the majority of the landscaping labor. Initially, Bonnie and Brian each paid for their own car insurance. But when they married in 2002, Brian added Bonnie to his car insurance. Bonnie also provided non-economic contributions to the family such as cooking and cleaning. After Brian hurt his shoulder, Bonnie also shoveled the snow.

---

[3] Bonnie explained Brian had a better cash flow than she did during the marriage: "[Brian had fewer] bills coming out monthly. Again, he was making double my salary at several portions of the marriage. And I had more expenses going out of my pocket for my children."

[4] At the time of trial, Bonnie's two sons were ages twenty-six and twenty-eight, and the total balance in Brian's 529 accounts had been reduced to around $1500. Brian has a close relationship with the son living in the Cedar Rapids area, who has graduated from college. Brian considers that son's child to be Brian's grandchild. Brian plans to roll his current 529 balances into a new 529 plan for the benefit of this grandchild.

Brian filed a dissolution petition on December 11, 2013, and trial commenced on August 20, 2015. The parties presented financial information to the court, including the value of various retirement accounts and the marital home. Brian proposed Bonnie "should receive zero of the equity in the marital residence" because he had made all the mortgage payments and because the parties "have always had separate accounts." He also asked to be awarded his health savings account, his defined-benefit plan, and his 401(k)—valued at over $1 million. Brian agreed Bonnie should retain her $73,000 in retirement accounts, and he urged the court to hold each party responsible for their own debts—Brian ($32,238) and Bonnie ($79,426).

In contrast, Bonnie asked the court to award her a marital portion of both Brian's 401(k) and his defined-benefit plan by the entry of qualified domestic relations orders (QDROs). She requested a portion of the marital home's equity and appreciation, pointing out the mortgage was joint debt. Bonnie sought a property-equalization payment and trial attorney fees.

The district court entered its decree dissolving the marriage and dividing the parties' assets on February 14, 2016. The court ordered each party to pay his or her attorney fees and required Bonnie to pay the remaining court costs. Both parties filed post-trial motions, which the court summarily denied. Brian now appeals, and Bonnie cross-appeals.

## II.    Scope and Standards of Review

We review the decree de novo. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). After examining the entire record, we adjudicate anew the property-distribution issues. *See id.* We give weight to the district

court's findings of fact, particularly with regard to witness credibility, though such findings are not binding. *See id.*

### III. Division of Property

When a couple divorces, Iowa law requires an equitable division of marital property. Iowa Code § 598.21(5) (2013); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). First, we determine what property held by the parties is subject to division. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007). Second, considering the factors in Iowa Code section 598.21(5), we decide how to equitably divide that property. *See id.* The property division does not need to be equal or follow a certain percentage; rather, this court makes an equitable award under the circumstances. *See In re Marriage of Hoak*, 364 N.W.2d 185, 194 (Iowa 1985). "[W]e will disturb a district court determination only when there has been a failure to do equity." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016); *see also In re Marriage of Vieth*, 591 N.W.2d 639, 641 (Iowa Ct. App. 1999) ("[W]e give strong deference to the trial court which, after sorting through the economic details of the parties, made a fair division supported by the record.").

We, like the district court, consider the parties' property in three broad categories—retirement assets, home appreciation, and equalization payment.

### A. Retirement Assets

The district court awarded Bonnie her three retirement accounts totaling $73,211. The parties do not challenge that award. It is the district court's calculation and distribution of Brian's more substantial retirement assets that the parties debate on appeal.

Generally, a property division involving retirement benefits evolves in two steps. *In re Marriage of Heath-Clark*, No. 15-0525, 2016 WL 2753779, at *3 (Iowa Ct. App. May 11, 2016). First, the district court enters a dissolution decree, which is a substantive order equitably dividing and assigning the parties' property. *Id.* (citing *In re Marriage of Brown*, 776 N.W.2d 644, 647-48 (Iowa 2009) (discussing finality of decrees, property division, and qualified domestic relations orders (QDROs)). Second, to implement the court's division of retirement benefits, a QDRO is entered that directs the plan administrator to make specified payments to the non-employee ex-spouse. *Id.* Thus, "a QDRO is characterized properly as a procedural device required by federal law and entered to effectuate the property division made in the dissolution decree." *Id.*

**Rockwell Collins Retirement Savings Plan—401(k).** Brian's 401(k) was worth $138,983 when the parties married in September 2002. The district court found, as of the August 2015 trial date, the value of this account was $1,061,238. The court set aside Brian's premarital value of $138,983 and ordered the asset "divided by way of a QDRO. Bonnie shall be awarded $387,916.50." On appeal, Bonnie claims the court should not have set aside the premarital value to Brian, asserting her numerous contributions to the marriage require that amount to be included. Bonnie also points out she "worked over a ten-year period to return to her previous earning capacity," which she claims limited her ability to save for retirement. But Brian testified Bonnie's limited savings is a result of her inappropriate spending on vehicles and other items during the marriage.

Premarital property is not automatically excluded from the marital estate like gifted or inherited property. *See* Iowa Code § 598.21(5)(b). Instead,

premarital property is subject to division, and its "premarital" status is just one factor to be considered along with other circumstances. *McDermott*, 827 N.W.2d at 678; *see also In re Marriage of Miller*, 552 N.W.2d 460, 465 (Iowa Ct. App. 1996) (explaining fact property is premarital "may" justify a set off). After our de novo review, we agree with the district court's finding that under the circumstances of this marriage, where both parties were gainfully employed before they married and each retained some financial independence during the marriage, equity requires the premarital value to be set aside to Brian. Thus, the *marital value* of Brian's 401(k) is $922,255, as specifically found by the district court.

Next, Brian and Bonnie both request an adjustment to the $922,255 marital value. Brian asks us to reduce the value before calculating a distribution amount to Bonnie, claiming a fixed dollar amount is inequitable where the gross value allegedly decreased after the trial and before entry of the decree. We are not persuaded. First, no evidence in the record supports his argument. Second, the trial date is a reasonable time to set the value. *See In re Marriage of Nelson*, No. 15-0492, 2016 WL 3269573, at *2 (Iowa Ct. App. Jun. 15, 2016) ("Assets should be given their value as of the date of trial."); *In re Marriage of Ranard*, No. 09-0607, 2010 WL 625013, at *4 (Iowa Ct. App. Feb. 24, 2010) (declining request to decrease retirement asset's value where value declined between trial and decree).

In a separate cross-appeal argument, Bonnie asserts the portion of 401(k) funds awarded to her "should be subject to gains and losses between the date of the decree and the distribution of funds into her name," citing as support several

cases from other jurisdictions and *In re Marriage of Madsen*, No. 09-1061, 2010 WL 786201, at *3 (Iowa Ct. App. Mar. 10, 2010) (granting order nunc pro tunc where decree was silent as to valuation date). Because we find *Madsen* distinguishable from the circumstances here[5] and because Bonnie does not cite any Iowa Supreme Court case so holding, we decline her requested modification.[6] *See, e.g.*, *In re Marriage of Muehlhaupt*, 439 N.W.2d 656, 661 (Iowa 1989) ("It is the net worth of the parties at the time of trial which is relevant in adjusting their property rights."); *Spencer v. Philipp*, No. 13-1887, 2014 WL 4230223, at *2 (Iowa Ct. App. Aug. 27, 2014) ("As a general rule, the task of materially altering substantive or procedural rights is best left to the General Assembly or the Supreme Court of Iowa.").

As a final matter, we conclude equity requires each party in this thirteen-year marriage to leave with an equal share of marital retirement assets. *See In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995) (stating appreciation in the value of assets during the marriage is a marital asset)*.* Accordingly, we modify the court's calculation, as requested by Bonnie, to provide that her marital share of Brian's 401(k) is $424,522, which results in both parties receiving $497,733 in marital retirement assets.[7] On remand, a QDRO consistent with this modification shall be entered.

---

[5] The *Madsen* court explained its ruling did not involve "a request to change the 'valuation date' set forth in the dissolution decree . . . . The decree was silent as to valuation date, it simply provided for equal division." *See* 2010 WL 786201, at *3. Unlike the district court in *Madsen*, the district court in this case specified a valuation date, stating: "The value of the 401(k) nearest the time of trial is $1,061,238."

[6] Neither party asked for this case to be retained by our supreme court. Our court applies "existing legal principles." *See* Iowa R. App. P. 6.1101(3).

[7] Brian's 401(k) has a marital value of $922,255, and Bonnie will keep her $73,211 in marital retirement assets, which makes the difference in the parties' marital retirement

**Defined-Benefit Pension.** In Iowa, pension benefits are marital property subject to an equitable distribution. *In re Marriage of Branstetter*, 508 N.W.2d 638, 641-42 (Iowa 1993). Our courts have recognized two methods of dividing pension benefits: the present value payable immediately or a percentage payable when the benefits become matured. *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996). Further, "there are two main types of pension plans: defined-benefit plans and defined-contribution plans." *In re Marriage of Sullins*, 715 N.W.2d 242, 248 (Iowa 2006). Brian's pension is a defined-benefit plan.[8] Generally, it is "desirable to divide a defined-benefit plan by using the percentage method," which is the method the district court used here. *See id.* Under the percentage method, an award is effectuated by a QDRO, "which is paid if and when the benefits mature." *Id.* at 250; *see also Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007) (stating non-member spouse receives "a share of the pension benefits at some point in the future when they become payable to the pensioner").

The district court ordered Brian's pension to be "divided using the *Benson* formula, (Bonnie shall receive one-half[9] of the fractional portion of the plan calculated by using [thirteen] years as the numerator, and the years of

---

assets $849,044. One-half of this difference is $424,522. When we deduct $424,522 from $922,255, Brian's remaining marital 401(k) is $497,733. When we add $424,522 to Bonnie's existing $73,211 in marital retirement assets, her marital retirement assets now likewise total $497,733. We note Brian's total 401(k) assets are $636,716 after the premarital set off is included.

[8] Depending on the formula used by Rockwell Collins for its pension plan, the future benefit payable to Brian may contain two variables: (1) years of service and (2) earnings. *See Benson*, 545 N.W.2d at 255.

[9] "Absent agreement to the contrary, and there is none, [Bonnie] should receive half of the marital share" of Brian's defined-benefit plan. *See In re Marriage of Kasik*, No. 15-1713, 2016 WL 4543981, at *2 (Iowa Ct. App. Aug. 31, 2016). As found by the district court, Bonnie's share is 50%.

contribution as the denominator)." Thus, although the decree made no provision for the entry of a QDRO as to this asset, the district court used the "service factor percentage method," which "divides the pension according to a percentage multiplied by a factor based on the member's service during the marriage and the member's total service." *See Faber*, 731 N.W.2d at 8.

On appeal, Brian argues for revision of both the numerator and the denominator. Before addressing his specific arguments, we turn to the analysis in *Benson*. In that case, our supreme court discussed the valuation and division of a defined-benefit plan in the context of a marital property settlement. 545 N.W.2d at 255-57. *Benson* instructed: "[T]he numerator [is] the number of years during the marriage [the employee] accrued benefits under the pension plan . . . and the denominator [is] the total number of year's [the employee's] benefits accrued prior to maturity (i.e., receipt of payments upon retirement.)" *See id.* at 255 (stating this fraction recognizes the percentage of the employee's pension "attributable to the parties' joint marital efforts"). In other words, this fraction is "based on the member's service during the marriage and the member's total service." *Faber*, 731 N.W.2d at 8.

Brian asks us to reduce the numerator from thirteen years to 3.75 years— the time he was *both* married *and* contributing to the plan. We are not persuaded to do so. Brian and Bonnie were married at the end of September 2002, and as of December 31, 2002, Brian had credited service in his pension of 23.58 years. Rockwell Collins discontinued employee contributions on September 30, 2006. Brian's credited service from December 31, 2002, to September 30, 2006, was 3.75 years. Thus, at the date Brian's contributions ended, his total credited

service was 27.33 years. Nevertheless, Brian was "covered" by the plan during his entire marriage, as shown by the fact Brian's credited service when he reaches age sixty-two will be 39.9167 years. *See Heath-Clark*, 2016 WL 2753779, at *5 (stating *Benson* formula is correctly set forth by using a numerator of "the number of quarters covered during the marriage period," i.e., the date of marriage through the date of the dissolution decree). We therefore affirm the district court's numerator—thirteen years.

As to the denominator, Brian faults the court's description, claiming the denominator includes the period of time *after* he stopped contributing to the plan and until the plan matures in the future. We agree the district court did not fully define the denominator portion of the fraction, and therefore, we modify the decree to conform to the *Benson* formula. *See id.* at *9 (Danilson, J., dissenting) (stating confusion as to the correct denominator under *Benson* "is compounded by other [supreme court cases] using different terminology to describe the denominator").

Under *Benson*, the denominator is the number of years Brian was "covered" by the plan "prior to conclusion (maturity))." *See* 545 N.W.2d at 255; *see also Faber*, 731 N.W.2d at 8 (stating *Benson* denominator is "the member's total service"); *Heath-Clark*, 2016 WL 2753779, at *8 (majority opinion) (upholding, under *Benson,* a provision stating "the denominator is the Member's total quarters of service covered by [the employer's pension plan] and used in calculating the Member's benefit"). Further, "the value of the pension benefit should be determined at the time of [the covered employee's] retirement." *In re Marriage of Colarusso*, 2015 WL 8464727, at *8 (Iowa Ct. App. Dec. 9, 2015).

Accordingly, we modify the decree and remand for the entry of a QDRO[10] to divide Brian's monthly pension benefits, if and when received,[11] under the following formula:

| Bonnie's Share = 50% | X | Thirteen Years | X | Monthly Benefit |
| | | Brian's Credited Service at Retirement, i.e., Maturity | | |

*See Benson*, 545 N.W.2d at 255 (stating denominator is "the total years of benefits accrued at maturity"); *Heath-Clark*, 2016 WL 2753779, at *6 ("The *Benson* formula is used to value and divide the portion of the defined benefit accrued during the parties' marriage 'in relation to the *total years of benefits accrued* at maturity.'" (emphasis added) (citation omitted)).

### B.     Appreciation of Marital Home

During the marriage, the home's assessed value appreciated by $54,915. The district court divided the appreciation equally, ordering Brian to pay Bonnie $27,457.50.  Brian appeals the court's "equal division" of the home's marital appreciation in value.  He seeks a pre-division setoff for his "extraordinary efforts made for the increase of an asset," i.e., the value of his work, or "sweat equity," he expended to remodel the home during the marriage.

Bonnie responds such a setoff would be contrary to *Fennelly*, which the district court quoted: "It is important to remember marriage does not come with a ledger.  Spouses agree to accept one another 'for better or worse.'  Each

---

[10] Providing for the entry of a QDRO on remand is sufficient relief as to Bonnie's request her award should be designated "as a separate interest in the defined-benefit plan."  In *Benson*, the court stated the "actual earnings attributable to [Bonnie's] separate retirement interest cannot be *awarded* to [her] as a separate value, because they are needed to generate the value of the ultimate 'defined' benefit."  *See* 545 N.W.2d at 257.

[11] We decline Bonnie's request we modify to "require that she be designated as a surviving spouse."  The *Benson* court stated the percentage formula "properly allocates the risk between the parties."  *See* 545 N.W.2d at 255.

person's total contributions to the marriage cannot be reduced to a dollar amount. Many contributions are incapable of calculation, such as love, support, and companionship." 737 N.W.2d at 97. We find Bonnie's position more persuasive. The parties shared the residence for about fourteen years. Bonnie contributed to its upkeep, paid the cable and utilities bills, and participated in the design and implementation of the remodeling projects, especially the landscaping portion. During the marriage the parties shared "love, support, and companionship." *See id.* Accordingly, we affirm the court's equal division of the marital home's appreciation in value. *See In re Marriage of Terry*, No. 11-1903, 2012 WL 2819333, at *5 (Iowa Ct. App. July 11, 2012) (recognizing "it does not matter whether the property has appreciated fortuitously or by the efforts of the parties").

### C.    Equalization Payment

The court ordered Brian to pay Bonnie $30,477 "for equalization of the debts and assets acquired during the marriage, valued at the time of trial." Both parties seek an adjustment of this payment on appeal.[12]

We agree with Brian that a correction of the court's mathematical error shows an equalization payment of $15,238.50 was intended by the court to achieve "equalization of the debts and assets acquired during the marriage."[13]

---

[12] In her cross-appeal, Bonnie claims the equalization payment "should be increased by $10,000 to at least reduce the disparity resulting from the division of household contents accumulated during the marriage." The district court rejected this assertion, finding: "The record does not contain detail on the value of household items." Based on this finding, the court ruled "the parties have equitably divided the household items" and did not adjust the equalization payment. On de novo review, we agree with the district court.
[13] Using the court's valuations, we find Brian's $15,819 in assets and $32,238 in debts results in a preliminary net worth of -$16,419.00. Bonnie's $32,520 in assets and $79,426 in debts results in a preliminary net worth of -$46,896. Brian paying Bonnie

Brian also argues the court incorrectly assigned two categories within Bonnie's debt as marital debt. First, he claims Bonnie's credit-card debt solely for her attorney fees is not marital debt. We agree. The trial court ordered Bonnie to pay her own attorney fees, and attorney fees "incurred in dissolution proceedings are not marital debt."[14] *Hansen*, 733 N.W.2d at 703 (stating it was error to characterize attorney fees as marital debt and adjusting equalization payment accordingly). Thus, in the chart below we use the court's valuations but disallow the $15,200 debt for Bonnie's attorney fees.

Additionally, Brian challenges the student-loan debt for Bonnie's son and Bonnie's own student-loan debt, claiming those amounts are not marital debts. At trial, Bonnie admitted Brian had no obligation to support her children; thus, this case differs from cases where the student's own parents are divorcing. The college debt for Bonnie's son—as can be separated out on the record before us—is not marital debt. Bonnie testified a $2297 student-loan bill was "exclusively related" to her son's college education. Therefore, we disallow that amount in the chart below.

Brian also seeks to remove $19,355.50—Bonnie's personal loan. Bonnie testified the loan went toward her son's education, her pursuit of a master's degree, and family expenses, such as her son's wedding. Because the record does not segregate the total into separate categories and because we believe

---

$15,238.50 to equalize the parties' assets and debts would result in both parties leaving the marriage with an ending net worth of -$31,657.50.

[14] On cross-appeal, Bonnie claims the district court erred in denying her request for an award of trial attorney fees. District courts have considerable discretion in awarding attorney fees in dissolution cases. *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa Ct. App. 1983). We find no abuse of discretion and affirm the district court. *See id.*

the debt Bonnie incurred during the marriage for her own education is a marital expense, we decline Brian's request to further reduce Bonnie's debt.

For her part, Bonnie claims the court failed to account for the additional equity in the home—$8482—created as the parties paid down the mortgage over the course of the marriage. Because Brian is keeping the home and is also taking over the existing mortgage debt—a debt that decreases his overall net worth—we agree equity requires Brian to include the $8482 in principal reduction during the marriage as his marital asset.

Based on the above revisions, we modify Brian's equalization payment to Bonnie to $10,731, as shown below:

|  | Brian | Bonnie |
|---|---|---|
| Parties' Assets | $15,819.00 | $32,530.00 |
| Reduced Mortgage | $8,482.00 |  |
| Parties' Debts | -$32,238.00 | -$79,426.00 |
| Attorney Fee Debt |  | $15,200.00 |
| Son's Education Debt |  | $2,297.00 |
| Net Worth | -$7,937.00 | -$29,399.00 |
| **Equalization** | **-$10,731.00** | **$10,731.00** |
| Ending Net Worth | -$18,668.00 | -$18,668.00 |

## D.  Summary

To recap, as to Brian's 401(k)—the Rockwell Collins Retirement Savings Plan—we modify the decree and remand for entry of a QDRO directing Rockwell Collins to pay benefits to Bonnie as a marital property settlement in the amount of $424,522. Next, we modify the decree and remand for the entry of a QDRO directing Rockwell Collins to pay pension benefits to Bonnie as a marital property

settlement under the following formula: 50% of the gross monthly or lump-sum benefit payable at the date of distribution to Brian multiplied by the "service factor." The numerator of the service factor is thirteen, and the denominator is Brian's total credited service at retirement as used in calculating Brian's benefit. We affirm the district court's order requiring Brian to pay Bonnie $27,457.50 for her share of the marital home's increase in value during the marriage. We modify the decree and remand for entry of an order requiring Brian to pay Bonnie $10,731.00 to equalize the parties' assets and debts.

## IV.    Appellate Attorney Fees and Costs

Both parties request attorney fees on appeal. An award of attorney fees is not a matter of right but rests in our discretion. *See McDermott*, 827 N.W.2d at 687. In exercising our discretion, "we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (citation omitted). Here, both parties were partially successful on appeal. Additionally, their yearly earnings are roughly equivalent. Considering these factors, we decline to award appellate attorney fees and split the costs equally.

**AFFIRMED AS MODIFIED AND REMANDED.**